VANCE, SECRETARY OF STATE *v.* TERRAZAS

No. 78–1143.  Argued October 30, 1979—Decided January 15, 1980

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., *post,* p. 270, and STEVENS, J., *post,* p. 272, filed opinions concurring in part and dissenting in part. BRENNAN, J., filed a dissenting opinion, in Part II of which STEWART, J., joined, *post,* p. 274. STEWART, J., filed a dissenting statement, *post,* p. 270.

*Allan A. Ryan, Jr.,* argued the cause for appellant. With him on the briefs were *Solicitor General McCree, Assistant*

*Attorney General Heymann, Deputy Solicitor General Geller, William G. Otis,* and *William C. Brown.*

*Kenneth K. Ditkowsky* argued the cause and filed a brief for appellee.

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 349 (a)(2) of the Immigration and Nationality Act (Act), 66 Stat. 267, 8 U. S. C. § 1481 (a)(2), provides that "a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by . . . taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof." The Act also provides that the party claiming that such loss of citizenship occurred must "establish such claim by a preponderance of the evidence" and that the voluntariness of the expatriating conduct is rebuttably presumed. § 349 (c), as added, 75 Stat. 656, 8 U. S. C. § 1481 (c).[1] The

---

[1] The relevant statutory provisions are §§ 349 (a)(2), (c) of the Act, 66 Stat. 267, as amended, 75 Stat. 656, as set forth in 8 U. S. C. § 1481:

"(a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

. . . . .

"(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof;

. . . . .

"(c) Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after September 26, 1961 under, or by virtue of, the provisions of this chapter or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. Except as otherwise provided in subsection (b) of this section, any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily."

issues in this case are whether, in establishing loss of citizenship under § 1481 (a)(2), a party must prove an intent to surrender United States citizenship and whether the United States Constitution permits Congress to legislate with respect to expatriation proceedings by providing the standard of proof and the statutory presumption contained in § 1481 (c).

## I

Appellee, Laurence J. Terrazas, was born in this country, the son of a Mexican citizen. He thus acquired at birth both United States and Mexican citizenship. In the fall of 1970, while a student in Monterrey, Mexico, and at the age of 22, appellee executed an application for a certificate of Mexican nationality, swearing "adherence, obedience, and submission to the laws and authorities of the Mexican Republic" and "expressly renounc[ing] United States citizenship, as well as any submission, obedience, and loyalty to any foreign government, especially to that of the United States of America. . . ." App. to Brief for Appellant 5a.[2] The certificate, which issued upon this application on April 3, 1971, recited that Terrazas had sworn adherence to the United Mexican States and that he "has expressly renounced all rights inherent to any other nationality, as well as all submission, obedience, and loyalty to any foreign government, especially to those which have recognized him as that na-

---

[2] The application contained the following statement:

"I therefore hereby expressly renounce . . . . . . . . . citizenship, as well as any submission, obedience, and loyalty to any foreign government, especially to that of . . . . . . . . . . . ., of which I might have been subject, all protection foreign to the laws and authorities of Mexico, all rights which treaties or international law grant to foreigners; and furthermore I swear adherence, obedience, and submission to the laws and authorities of the Mexican Republic."

The blank spaces in the statement were filled in with the words "Estados Unidos" (United States) and "Norteamerica" (North America), respectively. Brief for Appellant 4.

tional." *Id.*, at 8a. Terrazas read and understood the certificate upon receipt. App. to Juris. Statement 21a.

A few months later, following a discussion with an officer of the United States Consulate in Monterrey, proceedings were instituted to determine whether appellee had lost his United States citizenship by obtaining the certificate of Mexican nationality. Appellee denied that he had, but in December 1971 the Department of State issued a certificate of loss of nationality. App. to Brief for Appellant 31a. The Board of Appellate Review of the Department of State, after a full hearing, affirmed that appellee had voluntarily renounced his United States citizenship. App. to Juris. Statement 31a. As permitted by § 360 (a) of the Act, 66 Stat. 273, 8 U. S. C. § 1503 (a), appellee then brought this suit against the Secretary of State for a declaration of his United States nationality. Trial was *de novo.*

The District Court recognized that the first sentence of the Fourteenth Amendment,[3] as construed in *Afroyim* v. *Rusk,* 387 U. S. 253, 268 (1967), " 'protect[s] every citizen of this Nation against a congressional forcible destruction of his citizenship' " and that every citizen has " 'a constitutional right to remain a citizen . . . unless he voluntarily relinquishes that citizenship.' " App. to Juris. Statement 25a. A person of dual nationality, the District Court said, "will be held to have expatriated himself from the United States when it is shown that he voluntarily committed an act whereby he unequivocally renounced his allegiance to the United States." *Ibid.* Specifically, the District Court found that appellee had taken an oath of allegiance to Mexico, that he had "knowingly and understandingly renounced allegiance to the United States in connection with his Application for a Certificate of Mexican Nationality," *id.*, at 28a, and that "[t]he taking of

---

[3] The Fourteenth Amendment, § 1, reads: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

an oath of allegiance to Mexico and renunciation of a foreign country [*sic*] citizenship is a condition precedent under Mexican law to the issuance of a Certificate of Mexican Nationality." *Ibid.* The District Court concluded that the United States had "proved by a preponderance of the evidence that Laurence J. Terrazas knowingly, understandingly and voluntarily took an oath of allegiance to Mexico, and concurrently renounced allegiance to the United States," *id.,* at 29a, and that he had therefore "voluntarily relinquished United States citizenship pursuant to § 349 (a)(2) of the . . . Act." *Ibid.*

In its opinion accompanying its findings and conclusions, the District Court observed that appellee had acted "voluntarily in swearing allegiance to Mexico and renouncing allegiance to the United States," *id.,* at 25a, and that appellee "knew he was repudiating allegiance to the United States through his actions." *Ibid.* The court also said, relying upon and quoting from *United States* v. *Matheson,* 400 F. Supp. 1241, 1245 (SDNY 1975), aff'd, 532 F. 2d 809 (CA2), cert. denied, 429 U. S. 823 (1976), that "the declaration of allegiance to a foreign state in conjunction with the renunciatory language of United States citizenship 'would leave no room for ambiguity as to the intent of the applicant.'" App. to Juris. Statement 23a.

The Court of Appeals reversed. 577 F. 2d 7 (1978). As the Court of Appeals understood the law—and there appears to have been no dispute on these basic requirements in the Courts of Appeals—the United States had not only to prove the taking of an oath to a foreign state, but also to demonstrate an intent on appellee's part to renounce his United States citizenship. The District Court had found these basic elements to have been proved by a preponderance of the evidence; and the Court of Appeals observed that, "[a]ssuming that the proper [evidentiary] standards were applied, we are convinced that the record fully supports the court's findings." *Id.,* at 10. The Court of Appeals ruled, however, that under *Afroyim* v. *Rusk, supra,* Congress had no power to legislate the

evidentiary standard contained in § 1481 (c) and that the Constitution required that proof be not merely by a preponderance of the evidence, but by "clear, convincing and unequivocal evidence." 577 F. 2d, at 11. The case was remanded to the District Court for further proceedings.[4]

The Secretary took this appeal under 28 U. S. C. § 1252. Because the invalidation of § 1481 (c) posed a substantial constitutional issue, we noted probable jurisdiction. 440 U. S. 970.

## II

The Secretary first urges that the Court of Appeals erred in holding that a "specific intent to renounce U. S. citizenship" must be proved "before the mere taking of an oath of allegiance could result in an individual's expatriation." 577 F. 2d, at 11.[5] His position is that he need prove only the

---

[4] In remanding the case to the District Court, the Court of Appeals did not "necessarily requir[e] that court to conduct a new trial." 577 F. 2d, at 12. The Court of Appeals recognized that, even granting the higher standard of proof it had imposed on the District Court, the factual determinations already on the record might be adequate to permit consideration of the case on remand without the holding of another trial or evidentiary hearing. *Ibid.*

[5] The Court of Appeals' discussion of specific intent is submerged in its analysis of proper evidentiary standards. *Id.*, at 11. The absence of independent analysis undoubtedly resulted from the Secretary's failure to contend in either the District Court or the Court of Appeals that it was unnecessary to prove an intent to relinquish citizenship. Indeed, the jurisdictional statement filed by the Secretary in this Court presented the single question whether 8 U. S. C. § 1481 (c) is unconstitutional under the Citizenship Clause of the Fourteenth Amendment; it did not present separately the question whether proof of a specific intent to relinquish is essential to expatriation.

Our Rule 15 (1) (c) states that "[o]nly the questions set forth in the jurisdictional statement or fairly comprised therein will be considered by the court." The Secretary now argues that resolution of the intent issue is an essential, or at least an advisable, predicate to an intelligent resolution of the constitutionality of § 1481 (c). There is some merit in this position: arguably the intent issue is fairly comprised in the question set

voluntary commission of an act, such as swearing allegiance to a foreign nation, that "is so inherently inconsistent with the continued retention of American citizenship that Congress may accord to it its natural consequences, *i. e.,* loss of nationality." Brief for Appellant 24. We disagree.

In *Afroyim* v. *Rusk,* 387 U. S. 253 (1967), the Court held that § 401 (e) of the Nationality Act of 1940, 54 Stat. 1168–1169, which provided that an American citizen "shall lose his nationality by . . . [v]oting in a political election in a foreign state," contravened the Citizenship Clause of the Fourteenth Amendment. Afroyim was a naturalized American citizen who lived in Israel for 10 years. While in that nation, Afroyim voted in a political election. He in consequence was stripped of his United States citizenship. Consistently with *Perez* v. *Brownell,* 356 U. S. 44 (1958), which had sustained § 401 (e), the District Court affirmed the power of Congress to expatriate for such conduct regardless of the citizen's intent to renounce his citizenship. This Court, however, in overruling *Perez,* "reject[ed] the idea . . . that, aside from the Four-

---

forth in the jurisdictional statement. In any event, consideration of issues not present in the jurisdictional statement or petition for certiorari and not presented in the Court of Appeals is not beyond our power, and in appropriate circumstances we have addressed them. *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 320, n. 6 (1971); *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 66, 68–69 (1938) (parties agreed that *Swift* v. *Tyson,* 16 Pet. 1 (1842), was still good law). Cf. *Vachon* v. *New Hampshire,* 414 U. S. 478 (1974); *Moragne* v. *States Marine Lines,* 398 U. S. 375 (1970); *Silber* v. *United States,* 370 U. S. 717 (1962). See generally R. Stern & E. Gressman, Supreme Court Practice §§ 6.27 and 7.14 (5th ed. 1978).

As will be more apparent below, the Secretary, represented in this Court by the Solicitor General, has changed his position on the intent issue since the decision of the Court of Appeals; and his present position is at odds with a 1969 opinion of the Attorney General, 42 Op. Atty. Gen. 397, which interpreted *Afroyim* v. *Rusk* and guided the administrative actions of the State Department and the Immigration and Naturalization Service. The issue of intent is important, the parties have briefed it, and we shall address it.

teenth Amendment, Congress has any general power, express or implied, to take away an American citizen's citizenship without his assent." *Afroyim* v. *Rusk, supra,* at 257. The *Afroyim* opinion continued: § 1 of the Fourteenth Amendment is "most reasonably . . . read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it." 387 U. S., at 262.

The Secretary argues that *Afroyim* does not stand for the proposition that a specific intent to renounce must be shown before citizenship is relinquished. It is enough, he urges, to establish one of the expatriating acts specified in § 1481 (a) because Congress has declared each of those acts to be inherently inconsistent with the retention of citizenship. But *Afroyim* emphasized that loss of citizenship requires the individual's "assent," 387 U. S., at 257, in addition to his voluntary commission of the expatriating act. It is difficult to understand that "assent" to loss of citizenship would mean anything less than an intent to relinquish citizenship, whether the intent is expressed in words or is found as a fair inference from proved conduct. *Perez* had sustained congressional power to expatriate without regard to the intent of the citizen to surrender his citizenship. *Afroyim* overturned this proposition. It may be, as the Secretary maintains, that a requirement of intent to relinquish citizenship poses substantial difficulties for the Government in performance of its essential task of determining who is a citizen. Nevertheless, the intent of the Fourteenth Amendment, among other things, was to define citizenship; and as interpreted in *Afroyim,* that definition cannot coexist with a congressional power to specify acts that work a renunciation of citizenship even absent an intent to renounce. In the last analysis, expatriation depends on the will of the citizen rather than on the will of Congress and its assessment of his conduct.

The Secretary argues that the dissent in *Perez,* which it is said the Court's opinion in *Afroyim* adopted, spoke of con-

duct so contrary to undivided allegiance to this country that it could result in loss of citizenship without regard to the intent of the actor and that "assent" should not therefore be read as a code word for intent to renounce. But *Afroyim* is a majority opinion, and its reach is neither expressly nor implicitly limited to that of the dissent in *Perez*. Furthermore, in his *Perez* dissent, Mr. Chief Justice Warren, in speaking of those acts that were expatriating because so fundamentally inconsistent with citizenship, concluded by saying that in such instances the "Government is simply giving formal recognition to the inevitable consequence of the citizen's own voluntary surrender of his citizenship." *Perez* v. *Brownell, supra,* at 69. This suggests that the Chief Justice's conception of "actions in derogation of undivided allegiance to this country," 356 U. S., at 68, in fact would entail an element of assent.

In any event, we are confident that it would be inconsistent with *Afroyim* to treat the expatriating acts specified in § 1481 (a) as the equivalent of or as conclusive evidence of the indispensable voluntary assent of the citizen. "Of course," any of the specified acts "may be highly persuasive evidence in the particular case of a purpose to abandon citizenship." *Nishikawa* v. *Dulles,* 356 U. S. 129, 139 (1958) (Black, J., concurring). But the trier of fact must in the end conclude that the citizen not only voluntarily committed the expatriating act prescribed in the statute, but also intended to relinquish his citizenship.

This understanding of *Afroyim* is little different from that expressed by the Attorney General in his 1969 opinion explaining the impact of that case. 42 Op. Atty. Gen. 397. An "act which does not reasonably manifest an individual's transfer or abandonment of allegiance to the United States," the Attorney General said, "cannot be made a basis for expatriation." *Id.,* at 400. Voluntary relinquishment is "not confined to a written renunciation," but "can also be

manifested by other actions declared. expatriative under the [A]ct, if such actions are in derogation of allegiance to this country." *Ibid.* Even in these cases, however, the issue of intent was deemed by the Attorney General to be open; and, once raised, the burden of proof on the issue was on the party asserting that expatriation had occurred. *Ibid.* "In. each case," the Attorney General stated, "the administrative authorities must make a judgment, based on all the evidence, whether the individual comes within the terms of an expatriation provision and has in fact voluntarily relinquished his citizenship." *Id.,* at 401. It was under this advice, as the Secretary concedes, that the relevant departments of the Government have applied the statute and the Constitution to require an ultimate finding of an intent to expatriate. Brief for Appellant 56–57, n. 28.[6]

---

[6] As the Secretary states in his brief, Brief for Appellant 57, n. 28, "both the State Department and the Immigration and Naturalization Service have adopted administrative guidelines that attempt to ascertain the individual's intent by taking into consideration the nature of the expatriating act and the individual's statements and actions made in connection with that act."

The State Department's guideline evidences a position on intent quite similar to that adopted here:

"In the light of the *Afroyim* decision and the Attorney General's Statement of Interpretation of that decision, the Department now holds that the taking of a *meaningful* oath of allegiance to a foreign state is highly persuasive evidence of an intent to transfer or abandon allegiance. The taking of an oath that is not meaningful does not result in expatriation. The meaningfulness of the oath must be decided by the Department on the individual merits of each case." Department of State, 8 Foreign Affairs Manual § 224.2, p. 2 (1970) (emphasis in original).

Cf. Immigration and Naturalization Service, Interpretations § 349.1 (d) (2), p. 6976.4 (1970) (characterizing *Afroyim* as overruling *Perez*'s holding "that expatriation could flow from a voluntary act even though the citizen did not intend thereby to relinquish his United States citizenship").

Contemporaneous academic commentary agreed that *Afroyim* imposed the requirement of intent to relinquish citizenship on a party seeking to

Accordingly, in the case now before us, the Board of Appellate Review of the State Department found that appellee not only swore allegiance to Mexico, but also intended to abandon his United States citizenship: "In consideration of the complete record, we view appellant's declaration of allegiance to Mexico and his concurrent repudiation of any and all submission, obedience, and loyalty to the United States as compelling evidence of a specific intent to relinquish his United States citizenship." App. to Juris. Statement 50a. This same view—that expatriation depends on the will of a citizen as ascertained from his words and conduct—was also reflected in the United States' response to the petition for certiorari in *United States* v. *Matheson,* 532 F. 2d 809, cert. denied, 429 U. S. 823 (1976).[7] Insofar as we are advised, this view remained the official position of the United States until the appeal in this case.

As we have said, *Afroyim* requires that the record support a finding that the expatriating act was accompanied by an intent to terminate United States citizenship. The submission of the United States is inconsistent with this holding, and we are unprepared to reconsider it.

---

establish expatriation. See Comment, An Expatriation Enigma: Afroyim v. Rusk, 48 B. U. L. Rev. 295, 298 (1968); Note, Acquisition of Foreign Citizenship: The Limits of *Afroyim* v. *Rusk,* 54 Cornell L. Rev. 624, 624–625 (1969); The Supreme Court: 1966 Term, 81 Harv. L. Rev. 69, 126 (1967); Note, 29 Ohio St. L. J. 797, 801 (1968).

[7] In his response to the petition for certiorari in *Matheson,* the Solicitor General argued that *"Afroyim* broadly held that Congress has no power to prescribe any objective conduct that will automatically result in expatriation, absent the individual's voluntary relinquishment of citizenship. . . ." Brief in Opposition in *Matheson* v. *United States,* O. T. 1976, No. 75–1651, p. 8. In *Matheson,* it was maintained, "there is nothing in the record that would support a finding that decedent's application for a certificate of Mexican nationality was prompted by a specific intent to relinquish her American citizenship." *Id.,* at 7. Thus, the Solicitor General concluded no expatriation could be said to have taken place.

## III

With respect to the principal issues before it, the Court of Appeals held that Congress was without constitutional authority to prescribe the standard of proof in expatriation proceedings and that the proof in such cases must be by clear and convincing evidence rather than by the preponderance standard prescribed in § 1481 (c). We are in fundamental disagreement with these conclusions.

In *Nishikawa* v. *Dulles*, 356 U. S. 129 (1958), an American-born citizen, temporarily in Japan, was drafted into the Japanese Army. The Government later claimed that, under § 401 (c) of the Nationality Act of 1940, 54 Stat. 1169, he had expatriated himself by serving in the armed forces of a foreign nation. The Government agreed that expatriation had not occurred if Nishikawa's army service had been involuntary. Nishikawa contended that the Government had to prove that his service was voluntary, while the Government urged that duress was an affirmative defense that Nishikawa had the burden to prove by overcoming the usual presumption of voluntariness. This Court held the presumption unavailable to the Government and required proof of a voluntary expatriating act by clear and convincing evidence.

Section 1481 (c) soon followed; its evident aim was to supplant the evidentiary standards prescribed by *Nishikawa*.[8]

---

[8] The House Report accompanying § 1481 (c), H. R. Rep. No. 1086, 87th Cong., 1st Sess., 40 (1961), took direct aim at *Nishikawa*'s holding that "the Government must in each case prove voluntary conduct by clear, convincing and unequivocal evidence." *Nishikawa* v. *Dulles*, 356 U. S., at 138. The Report quoted with approval from Mr. Justice Harlan's dissenting opinion in *Nishikawa*:

" 'Although the Court recognizes the general rule that consciously performed acts are presumed voluntary [citations omitted], it in fact alters this rule in all denationalization cases by placing the burden of proving voluntariness on the Government, thus relieving citizen-claimants in such cases from the duty of proving that their presumably voluntary acts were actually involuntary.

" 'One of the prime reasons for imposing the burden of proof on the

The provision "sets up rules of evidence under which the burden of proof to establish loss of citizenship by preponderance of the evidence would rest upon the Government. The presumption of voluntariness under the proposed rules of evidence, would be rebuttable—similarly—by preponderance of the evidence. . . ." H. R. Rep. No. 1086, 87th Cong., 1st Sess., 41 (1961).

We see no basis for invalidating the evidentiary prescriptions contained in § 1481 (c). *Nishikawa* was not rooted in the Constitution. The Court noted, moreover, that it was acting in the absence of legislative guidance. *Nishikawa* v. *Dulles, supra,* at 135. Nor do we agree with the Court of Appeals that, because under *Afroyim* Congress is constitutionally devoid of power to impose expatriation on a citizen, it is also without power to prescribe the evidentiary standards to govern expatriation proceedings. 577 F. 2d, at 10. Although § 1481 (c) had been law since 1961, *Afroyim* did not address or advert to that section; surely the Court would have said so had it intended to construe the Constitution to exclude expatriation proceedings from the traditional powers of Congress to prescribe rules of evidence and standards of proof in the federal courts. This power, rooted in the au-

---

party claiming involuntariness is that the evidence normally lies in his possession.

"'I . . . find myself compelled to dissent because in my opinion the majority's position can be squared neither with congressional intent nor with proper and well-established rules governing the burden of proof on the issue of duress.'" H. R. Rep. No. 1086, *supra,* at 41 (quoting *Nishikawa* v. *Dulles, supra,* at 144–145).

The Report continued:

"In order to forestall further erosion of the statute designed to preserve and uphold the dignity and the priceless value of U. S. citizenship, with attendant obligations, [§ 1481 (c)] sets up rules of evidence under which the burden of proof to establish loss of citizenship by preponderance of the evidence would rest upon the Government." H. R. Rep. No. 1086, *supra,* at 41. The Report concluded by describing the rebuttable presumption of voluntariness in § 1481 (c).

thority of Congress conferred by Art. 1, § 8, cl. 9, of the Constitution to create inferior federal courts, is undoubted and has been frequently noted and sustained. See, *e. g., Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 31 (1976); *Hawkins* v. *United States,* 358 U. S. 74, 78 (1958); *Tot* v. *United States,* 319 U. S. 463, 467 (1943).

We note also that the Court's opinion in *Afroyim* was written by Mr. Justice Black who, in concurring in *Nishikawa,* said that the question whether citizenship has been voluntarily relinquished is to be determined on the facts of each case and that Congress could provide rules of evidence for such proceedings. *Nishikawa* v. *Dulles, supra,* at 139. In this respect, we agree with Mr. Justice Black; and since Congress has the express power to enforce the Fourteenth Amendment, it is untenable to hold that it has no power whatsoever to address itself to the manner or means by which Fourteenth Amendment citizenship may be relinquished.

We are unable to conclude that the specific evidentiary standard provided by Congress in § 1481 (c) is invalid under either the Citizenship Clause or the Due Process Clause of the Fifth Amendment. It is true that in criminal and involuntary commitment contexts we have held that the Due Process Clause imposes requirements of proof beyond a preponderance of the evidence. *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975); *Addington* v. *Texas,* 441 U. S. 418 (1979). This Court has also stressed the importance of citizenship and evinced a decided preference for requiring clear and convincing evidence to prove expatriation. *Nishikawa* v. *United States, supra.* But expatriation proceedings are civil in nature and do not threaten a loss of liberty. Moreover, as we have noted, *Nishikawa* did not purport to be a constitutional ruling, and the same is true of similar rulings in related areas. *Woodby* v. *INS,* 385 U. S. 276, 285 (1966) (deportation); *Schneiderman* v. *United States,* 320 U. S. 118, 125 (1943) (denaturalization). None of these cases involved a congressional judg-

ment, such as that present here, that the preponderance standard of proof provides sufficient protection for the interest of the individual in retaining his citizenship. Contrary to the Secretary's position, we have held that expatriation requires the ultimate finding that the citizen has committed the expatriating act with the intent to renounce his citizenship. This in itself is a heavy burden, and we cannot hold that Congress has exceeded its powers by requiring proof of an intentional expatriating act by a preponderance of evidence.

## IV

The Court of Appeals did not discuss separately the validity of the statutory presumption provided in § 1481 (c). By holding that the section was beyond the power of Congress, however, and by requiring that the expatriating act be proved voluntary by clear and convincing evidence, the Court of Appeals effectively foreclosed use of the § 1481 (c) presumption of voluntariness, not only in the remand proceedings in the District Court, but also in other expatriation proceedings in that Circuit. As we have indicated, neither the Citizenship Clause nor *Afroyim* places suits such as this wholly beyond the accepted power of Congress to prescribe rules of evidence in federal courts. We also conclude that the presumption of voluntariness provided in § 1481 (c) is not otherwise constitutionally infirm.

Section 1481 (c) provides in relevant part that "any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily." In enacting § 1481 (c), Congress did not dispute the holding of *Nishikawa* that the alleged expatriating act—there, service in a foreign army—must be performed voluntarily, but it did

insist that the Government have the benefit of the usual presumption of voluntariness and that one claiming that his act was involuntary make out his claim of duress by a preponderance of the evidence.

It is important at this juncture to note the scope of the statutory presumption. Section 1481 (c) provides that any of the statutory expatriating acts, if proved, are presumed to have been committed voluntarily. It does not also direct a presumption that the act has been performed with the intent to relinquish United States citizenship. That matter remains the burden of the party claiming expatriation to prove by a preponderance of the evidence. As so understood, we cannot invalidate the provision.[9]

The majority opinion in *Nishikawa* referred to the "ordinary rule that duress is a matter of affirmative defense" to be proved by the party claiming the duress. *Nishikawa* v. *Dulles*, 356 U. S., at 134. Justices Frankfurter and Burton, concurring in the result, also referred to the "ordinarily controlling principles of evidence [that] would suggest that the individual, who is peculiarly equipped to clarify an ambiguity in the meaning of outward events, should have the burden of proving what his state of mind was." *Id.*, at 141. And Mr. Justice Harlan, in dissent with Mr. Justice Clark, pointed to the "general rule that consciously performed acts are presumed voluntary" and referred to Federal Rule of Civil Procedure 8 (c), which treats duress as a matter of affirmative defense. 356 U. S., at 144. Yet the Court in *Nishikawa*,

---

[9] The Secretary asserts that the § 1481 (c) presumption cannot survive constitutional scrutiny if we hold that intent to relinquish citizenship is a necessary element in proving expatriation. Brief for Appellant 26. The predicate for this assertion seems to be that § 1481 (c) presumes intent to relinquish as well as voluntariness. We do not so read it. Even if we did, and even if we agreed that presuming the necessary intent is inconsistent with *Afroyim*, it would be unnecessary to invalidate the section insofar as it presumes that the expatriating act itself was performed voluntarily.

because it decided that "the consequences of denationalization are so drastic" and because it found nothing indicating a contrary result in the legislative history of the Nationality Act of 1940, held that the Government must carry the burden of proving that the expatriating act was performed voluntarily. *Id.,* at 133–138.[10]

Section 1481 (c), which was enacted subsequently, and its legislative history, H. R. Rep. No. 1086, 87th Cong., 1st Sess., 40–41 (1961), make clear that Congress preferred the ordinary rule that voluntariness is presumed and that duress is an affirmative defense to be proved by the party asserting it. See *Hartsville Oil Mill* v. *United States,* 271 U. S. 43, 49–50 (1926); *Towson* v. *Moore,* 173 U. S. 17, 23–24 (1899); *Savage* v. *United States,* 92 U. S. 382, 387–388 (1876). "Duress, if proved, may be a defence to an action . . . but the burden of proof to establish the charge . . . is upon the party making it. . . ." *Mason* v. *United States,* 17 Wall. 67, 74 (1873).[11] The rationality of the procedural rule with respect to claims of involuntariness in ordinary civil cases cannot be doubted. To invalidate the rule here would be to disagree flatly with Con-

---

[10] The Court's departure from the normal rule that duress is an affirmative defense to be proved by the party seeking to rely on it was noted when *Nishikawa* was handed down. See The Supreme Court: 1957 Term, 72 Harv. L. Rev. 77, 166, 171 (1958) (*Nishikawa* "not only extended the Government's burden in expatriation proceedings to include the absence of duress if this issue is raised, but also determined the standard by which it must be shown. The position of the majority runs counter to the usual rule that duress is an affirmative defense").

[11] The rule that duress is an affirmative defense to be pleaded and proved by the party attempting to rely on it is well established. Even where a plaintiff's complaint improperly contains allegations that seek to avoid or defeat a potential affirmative defense, "it is inappropriate for the court to shift the burden of proof on the anticipated defense to plaintiff as a 'sanction' for failing to follow the burden of pleading structure established by Rule 8 or by adopting the fiction that plaintiff's anticipation of the issue evidences his intention to 'assume' the burden of proving it." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1276, p. 327 (1969). On affirmative defenses generally, see *id.,* § 1270, at 289 *et seq.*

gress on the balance to be struck between the interest in citizenship and the burden the Government must assume in demonstrating expatriating conduct. It would also constitutionalize that disagreement and give the Citizenship Clause of the Fourteenth Amendment far more scope in this context than the relevant circumstances that brought the Amendment into being would suggest appropriate. Thus we conclude that the presumption of voluntariness included in § 1481 (c) has continuing vitality.

## V

In sum, we hold that in proving expatriation, an expatriating act and an intent to relinquish citizenship must be proved by a preponderance of the evidence. We also hold that when one of the statutory expatriating acts is proved, it is constitutional to presume it to have been a voluntary act until and unless proved otherwise by the actor. If he succeeds, there can be no expatriation. If he fails, the question remains whether on all the evidence the Government has satisfied its burden of proof that the expatriating act was performed with the necessary intent to relinquish citizenship.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE STEWART dissents for the reasons stated in Part II of MR. JUSTICE BRENNAN's dissenting opinion, which he joins.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree with the Court's holding that a citizen of the United States may not lose his citizenship in the absence of a finding that he specifically intended to renounce it. I also concur in the adoption of a saving construction of 8 U. S. C. § 1481

(a)(2) to require that the statutorily designated expatriating acts be done with a specific intent to relinquish citizenship.

I cannot, however, accept the majority's conclusion that a person may be found to have relinquished his American citizenship upon a preponderance of the evidence that he intended to do so. The Court's discussion of congressional power to "prescribe rules of evidence and standards of proof in the federal courts," *ante,* at 265, is the beginning, not the end, of the inquiry. It remains the task of this Court to determine when those rules and standards impinge on constitutional rights. As my Brother STEVENS indicates, the Court's casual dismissal of the importance of American citizenship cannot withstand scrutiny. And the mere fact that one who has been expatriated is not locked up in a prison does not dispose of the constitutional inquiry. As Mr. Chief Justice Warren stated over 20 years ago:

"[T]he expatriate has lost the right to have rights.

"This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people. He is stateless, a condition deplored in the international community of democracies. It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious." *Trop* v. *Dulles,* 356 U. S. 86, 102 (1958) (plurality opinion) (footnotes omitted).

For these reasons I cannot understand, much less accept, the Court's suggestion that "expatriation proceedings . . . do not threaten a loss of liberty." *Ante,* at 266. Recognizing that

a standard of proof ultimately "'reflects the value society places'" on the interest at stake, *Addington* v. *Texas,* 441 U. S. 418, 425 (1979), I would hold that a citizen may not lose his citizenship in the absence of clear and convincing evidence that he intended to do so.

Mr. Justice Stevens, concurring in part and dissenting in part.

The Court today unanimously reiterates the principle set forth in *Afroyim* v. *Rusk,* 387 U. S. 253, that Congress may not deprive an American of his citizenship against his will, but may only effectuate the citizen's own intention to renounce his citizenship. I agree with the Court that Congress may establish certain standards for determining whether such a renunciation has occurred. It may, for example, provide that expatriation can be proved by evidence that a person has performed an act that is normally inconsistent with continued citizenship and that the person thereby specifically intended to relinquish his American citizenship.

I do not agree, however, with the conclusion that Congress has established a permissible standard in 8 U. S. C. § 1481 (a)(2). Since we accept dual citizenship, taking an oath of allegiance to a foreign government is not necessarily inconsistent with an intent to remain an American citizen. Moreover, as now written, the statute cannot fairly be read to require a finding of specific intent to relinquish citizenship. The statute unambiguously states that

> "a national of the United States . . . shall lose his nationality by—
>
> .        .        .        .        .
>
> "(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof."

There is no room in this provision to imply a requirement of a specific intent to relinquish citizenship. The Court does

not attempt to do so, nor does it explain how any other part of the statute supports its conclusion that Congress required proof of specific intent.[1]

I also disagree with the holding that a person may be deprived of his citizenship upon a showing by a mere preponderance of the evidence that he intended to relinquish it. The Court reasons that because the proceedings in question are civil in nature and do not result in any loss of physical liberty, no greater burden of proof is required than in the ordinary civil case. Such reasoning construes the constitutional concept of "liberty" too narrowly.

The House Report accompanying the 1961 amendment to the Immigration and Naturalization Act of 1952 refers to "the dignity and the priceless value of U. S. citizenship." H. R.

---

[1] It could perhaps be argued that a specific intent requirement can be derived from 8 U. S. C. § 1481 (c). That subsection creates a rebuttable presumption that any expatriating act set forth in subsection (a) was performed "voluntarily." The term "voluntary" could conceivably be stretched to include the concept of a specific intent to renounce one's citizenship. While the person seeking to retain his citizenship would thus have the burden of showing a lack of specific intent, such a construction would at least provide a statutory basis for bringing the issue of intent into the proceeding. The majority apparently would not be willing to accept such a construction in order to salvage the statute, however, inasmuch as it rejects the appellant Secretary's argument that, if there is a requirement of specific intent, it is also subject to the presumption applicable to voluntariness. *Ante,* at 268.

The majority's assumption that the statute can be read to require specific intent to relinquish citizenship as an element of proof is also contradicted by the Court's treatment in *Afroyim* of a different subsection of the same statute. Like the subsection at issue here, subsection (a)(5) provided that an American automatically lost his nationality by performing a specific act: in that case, voting in a foreign election. If the majority's analysis in this case were correct, the Court in *Afroyim* should not have invalidated that provision of the statute; rather, it should merely have remanded for a finding as to whether Afroyim had voted in a foreign election with specific intent to relinquish his American citizenship. That the Court did not do so is strong evidence of its belief that the statute could not be reformed as it is today.

Rep. No. 1086, 87th Cong., 1st Sess., 41 (1961). That characterization is consistent with this Court's repeated appraisal of the quality of the interest at stake in this proceeding.[2] In my judgment a person's interest in retaining his American citizenship is surely an aspect of "liberty" of which he cannot be deprived without due process of law. Because the interest at stake is comparable to that involved in *Addington* v. *Texas,* 441 U. S. 418, essentially for the reasons stated in THE CHIEF JUSTICE's opinion for a unanimous Court in that case, see *id.,* at 425–427, 431–433, I believe that due process requires that a clear and convincing standard of proof be met in this case as well before the deprivation may occur.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART joins as to Part II, dissenting.

The Court holds that one may lose United States citizenship if the Government can prove by a preponderance of the evidence that certain acts, specified by statute, were done with the specific intent of giving up citizenship. Accordingly, the Court, in reversing the judgment of the Court of Appeals, holds that the District Court applied the correct evidentiary standards in determining that appellee was properly stripped of his citizenship. Because I would hold that one who acquires United States citizenship by virtue of being born in the United States, U. S. Const., Amdt. 14, § 1, can lose that citizenship only by formally renouncing it, and because I would hold that the act of which appellee is accused in this case cannot be an expatriating act, I dissent.

I

This case is governed by *Afroyim* v. *Rusk,* 387 U. S. 253

---

[2] See *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 160, where the Court quoted another report describing American citizenship as " 'one of the most valuable rights in the world today.' " See also *Afroyim* v. *Rusk,* 387 U. S. 253, 267–268; *Trop* v. *Dulles,* 356 U. S. 86, 92.

(1967). *Afroyim,* emphasizing the crucial importance of the right of citizenship, held unequivocally that a citizen has "a constitutional right to remain a citizen . . . unless he voluntarily relinquishes that citizenship." *Id.,* at 268. "[T]he only way the citizenship . . . could be lost was by the voluntary renunciation or abandonment by the citizen himself." *Id.,* at 266. The Court held that because Congress could not "abridge," "affect," "restrict the effect of," or "take . . . away" citizenship, Congress was "without power to rob a citizen of his citizenship" because he voted in a foreign election. *Id.,* at 267.

The same clearly must be true of the Government's attempt to strip appellee of citizenship because he swore an oath of allegiance to Mexico.[1] Congress has provided for a procedure by which one may formally renounce citizenship.[2] In this case the appellant concedes that appellee has not renounced his citizenship under that procedure.[3] Brief for Appellant 56. Because one can lose citizenship only by voluntarily renouncing it and because appellee has not formally renounced his, I would hold that he remains a citizen. Accordingly, I would remand the case with orders that appellee be given a declaration of United States nationality.[4]

---

[1] He was a Mexican citizen by virtue of his father's citizenship.

[2] Title 8 U. S. C. § 1481 (a) (6) provides that "a national of the United States whether by birth or naturalization, shall lose his nationality by . . .

. . . . .

making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State." The Secretary of State has prescribed such procedures in 22 CFR § 50.50 (1979). See Department of State, 8 Foreign Affairs Manual § 225.6 (1972). Congress also provided for renunciation by citizens while in the United States in 8 U. S. C. § 1481 (a) (7). This last provision is not relevant to our case.

[3] Therefore, the appellant does not argue that appellee can be expatriated under 8 U. S. C. § 1481 (a) (6). See n. 2, *supra.*

[4] I would not reach the issues concerning 8 U. S. C. § 1481 (c).

## II

I reach the same result by another, independent line of reasoning. Appellee was born a dual national. He is a citizen of the United States because he was born here and a citizen of Mexico because his father was Mexican. The only expatriating act of which appellee stands accused is having sworn an oath of allegiance to Mexico. If dual citizenship, *per se,* can be consistent with United States citizenship, *Perkins* v. *Elg,* 307 U. S. 325, 329 (1939),[5] then I cannot see why an oath of allegiance to the other country of which one is already a citizen should create inconsistency. One owes allegiance to any country of which one is a citizen, especially when one is living in that country. *Kawakita* v. *United States,* 343 U. S. 717, 733–735 (1952).[6] The formal oath adds nothing to the existing foreign citizenship and, therefore, cannot affect his United States citizenship.

---

[5] *Rogers* v. *Bellei,* 401 U. S. 815 (1971), is not to the contrary. Bellei's citizenship was not based on the Fourteenth Amendment, *id.,* at 833, 835, and the issue before the Court was whether Bellei could lose his statutory citizenship for failure to satisfy a condition subsequent contained in the same statute that accorded him citizenship.

[6] Indeed, the opinion of the State Department once was "that a person with a dual citizenship who lives abroad in the other country claiming him as a national owes an allegiance to it which is paramount to the allegiance he owes the United States." *Kawakita* v. *United States,* 343 U. S., at 734–735.