Ricardo
MALDONADO–SANCHEZ, Plaintiff,

v.

George P. SHULTZ, Defendant.

Civ. No. 87–2654.

United States District Court,
District of Columbia.

Jan. 30, 1989.

A. Neal Burkus and Paul E. Mirengoff, Hunton & Williams, Washington, D.C., for plaintiff.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for defendant.

MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff, Ricardo Maldonado–Sanchez, upon his birth in New York City, New York, on August 4, 1948, acquired dual citizenship in both the United States and Venezuela, the latter due to his parents' Venezuelan citizenship.[1] On June 15, 1967, plaintiff, then age 18, and his father went to the United States Embassy in Caracas,

---

1. Plaintiff travelled back and forth between Venezuela and the United States between 1948 and 1967. There are conflicting statements as to the time plaintiff spent in Venezuela during his youth. Plaintiff states that he lived in New York from his birth through 1967 "except for moments when we went to Venezuela ... in 1954 to '57." Tr. at 15. Defendant's Exhibit 7, an Operations Memorandum from the Venezuelan Embassy to the Department of State, states that plaintiff resided in Venezuela from 1948 to 1958, and again from 1960 through 1966.

Venezuela, where he executed a renunciation of citizenship, which resulted in a Certificate of Loss of Nationality ("CLN").[2]

While in the United States on a visitor's visa in 1986, plaintiff applied for and was denied a United States passport. The State Department informed plaintiff that because he had been issued a CLN, he was no longer a United States citizen and, therefore, could not be issued a passport. Plaintiff appealed to the State Department's Board of Appellate Review which, after a hearing, dismissed plaintiff's claim for lack of jurisdiction. Defendant's Ex. 13. Having exhausted his administrative remedies, plaintiff sought relief in this court.

Plaintiff maintains that he did not renounce his United States citizenship knowingly or voluntarily. He claims that he was coerced and misled by his father to give up his citizenship. After he registered for the draft, following his eighteenth birthday, his mother became despondent over the possibility that he would be drafted, sent to Vietnam, and killed. When plaintiff's high school graduation was imminent and he had not been accepted into the universities favored by his father, he asserts that his father unilaterally determined that plaintiff should give up his U.S. citizenship to avoid the draft.

Plaintiff claims that he protested to his father that he could try to get into other colleges and thereby elude the draft but his father would not permit this. Instead, the plaintiff's father insisted that the whole family move to Italy where they would try to enroll plaintiff in a university. Before Italy, however, the family would stop briefly in Venezuela for plaintiff to renounce his United States citizenship.

Plaintiff claims that he had no choice in this matter. He states that his father was a very strong-willed man who would not permit defiance by his son. Plaintiff claims that his father told him the renunciation was not permanent and that he could regain his U.S. citizenship after the

war. Plaintiff avers that for both economic and emotional reasons, he could not defy his father and remain in the United States.

At the United States Embassy in Venezuela, plaintiff claims that he was given a form to fill out and spoke very briefly with the Vice–Consul. He admits that the Vice–Consul advised him that his renunciation would be permanent. He claims, however, that this was the first time he had been so informed and chose not to believe this official but rather to believe his father, who had consistently declared that it was only temporary, prior to his arrival at the Embassy.

Plaintiff claims, therefore, that he did not voluntarily renounce his citizenship and that he had no intention, at the time of the renunciation, to permanently give up his U.S. citizenship. He maintains that he was coerced by the strength of family pressure and the lack of correct information into relinquishing his citizenship.

Defendant, Secretary of the State Department ("Secretary"), moves to dismiss the complaint as being barred by the statute of limitations or for summary judgment. Defendant argues that the CLN was issued upon a determination that plaintiff voluntarily and intentionally relinquished his citizenship. Moreover, the Secretary contends that plaintiff may not, some twenty years after the fact, challenge the issuance of his CLN since the statute of limitations on such challenges is five years. Plaintiff, on the other hand, contends that the statute of limitations did not begin to run until his request for a passport in 1986 was denied. After careful consideration of the submissions of the parties and the relevant case law, the motion of defendant will be granted.

## DISCUSSION

### A. Statute of Limitations

While the Secretary maintains that he is entitled to summary judgment on the

---

**2.** Plaintiff executed a statement declaring that he was renouncing his United States citizenship because he wanted to remain in Venezuela for the rest of his life. Defendant's Ex. 1. In addition, plaintiff signed an "Oath of Renunciation of the Nationality of the United States". Defendant's Ex. 2.

merits of this case, he also argues that the Court need not reach this issue as the plaintiff's claim is time-barred. The parties agree that plaintiff's relief is sought pursuant to 8 U.S.C. § 1503(a) which states in pertinent part:

"If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department ... upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28 ... An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege ..."

Defendant claims that the "final administrative" action referred to in this statute was the issuance of the CLN in 1967, declaring plaintiff's renunciation of citizenship. Plaintiff maintains that the "final administrative" action is the request and subsequent denial of a U.S. passport in 1986, which is clearly within the five-year limitations period. Thus, the first issue before the Court is whether issuance of the CLN triggered the limitations period.

Statutory interpretation always begins with an examination of the plain meaning of the statute. *See Regular Common Carrier Conference v. United States*, 820 F.2d 1323, 1326 (D.C.Cir.1987). The pertinent language is: "If any person ... claims a right or privilege as a national of the United States and is denied such right or privilege ... on the ground that he is not a national of the United States, such person may institute an action ... only within five years after the final administrative denial of such right or privilege ..." 8 U.S.C. § 1503(a).

First, in order for the statute to apply, the plaintiff must have asserted a claim of right or privilege as a United States national. Plaintiff argues that a renunciation of citizenship is not a *claim* to a right or

privilege but rather a disavowal of a right. Defendant argues that renunciation is a privilege of citizenship and that plaintiff exercised this right when he sought and received his CLN. Indeed, there is support for this position. The Court in *Garcia–Sarquiz v. Saxbe*, 407 F.Supp. 789, 792 (S.D.Fla.1974), aff'd 527 F.2d 1389 (5th Cir. 1976) stated: "The plaintiff has claimed the denial of the most fundamental right or privilege of a national of the United States, to wit: his citizenship. This occurred at the time of the entry of the Certificate of the Loss of Nationality ..." *But see, Whitehead v. Haig*, 794 F.2d 115, 120, n. 5 (3rd Cir.1986) (Becker, J., concurring).

However, even if renunciation of citizenship can be characterized as a claim to a right or privilege as a national, plaintiff maintains that the issuance of the CLN is an approval of the claim and not a denial. The Secretary, in contrast, argues that the issuance of a CLN is a *denial* of the right to citizenship. He contends, and the Court agrees, that as a national, plaintiff had the right to request relinquishment of his citizenship. Having this request *granted* by way of a CLN simply cannot be characterized as a *denial* of a right; the right to renounce citizenship has clearly been granted. *See Whitehead, supra,* at 119 ("[R]egardless of whether [renunciation is] ... a claim, we find there was no denial such as would allow the time limitation of 1503(a) to being running.") Accordingly, there has been no right *denied* pursuant to the statute.

Moreover, the denial of the claim to a right must be based "upon the ground that [the person] is not a national of the United States." The issuance of CLN is a declaration of the loss of citizenship. It is based upon the conclusion that the renunciant voluntarily and intentionally forfeited his citizenship, not upon a finding that the applicant is not a national.[3] The CLN process simply does not comport with the language of the statute. Any attempt at describing the CLN procedure so that it mir-

---

3. Indeed, one must be a national in order to take the oath of renunciation. Section 225.6(b) of the Foreign Affairs Manual provides:

"The officer initially must verify whether a would-be renunciant does possess the United States nationality which he seeks to surrender."

rors the terminology of section 1503 results in a distortion of the plain language of the statute. Therefore, the Court concludes that the five-year limitations period does not begin to run upon the issuance of a CLN.

The parties do not address this issue in detail but rather focus on the statutory requirement that the limitations period begins to run after the *"final administrative denial"* of the claim (emphasis added). Plaintiff argues that the issuance of a CLN is a ministerial, not an administrative, determination and relies upon *Whitehead v. Haig,* 794 F.2d 115 (3rd Cir.1986) to support this contention. "We are hard pressed," the Third Circuit found, "to see how a 'final administrative denial' may result from an automatic issuance of a document which does not involve administrative proceedings." That court reviewed and discussed the legislative history of section 1501, which provides the procedures for the issuance of a CLN,[4] and concluded that it was "not intended to provide any mechanism for administrative adjudication or determination by the Secretary of State as part of its mandate to approve and issue the Certificate of Loss." *Id.* at 118. It found that no "final administrative denial" occurred at the time of issuance and the statute had not yet begun to run.

The Secretary argues that the issuance of a CLN is a final administrative determination and relies upon *Linzalone v. Dulles,* 120 F.Supp. 107 (S.D.N.Y.1954) for support. In *Linzalone,* the plaintiff therein received a CLN and was subsequently placed in deportation proceedings. As a defense to deportation, he sought a declaration of citizenship pursuant to section 1503(a). Defendant moved to dismiss arguing that the section requires a final administrative de-

termination and that because a CLN was not such a determination, the plaintiff could not rely upon section 1503(a) for jurisdictional purposes.

The Court denied the motion of defendant reasoning that "[i]f there is no administrative proceeding available to relieve the party, then the administrative denial is final and an action will lie under the Act." *Id.* at 109. Defendant additionally cites *Garcia–Sarquiz v. Saxbe,* 407 F.Supp. 789 (S.D.Fla.1974), where the court found that the issuance of a CLN is a denial pursuant to section 1503(a).[5]

As noted above, the Court finds that there has been no *denial* of "a right or privilege ... [based] upon the ground that [the individual] is not a national of the United States ..." pursuant to the statute. Accordingly, the statute of limitations contained in section 1503(a) did not begin to run at the time of issuance of plaintiff's CLN. Having so found, it is unnecessary for the Court to decide if the CLN process is an "administrative" determination pursuant to the statute.

 The Court finds that when plaintiff requested and was denied a U.S. passport in 1986, the statute of limitations period provided in section 1503(a) was triggered. At that time, plaintiff, alleging his renunciation invalid, requested a passport. The Secretary refused to issue the passport upon the grounds that plaintiff had renounced his citizenship in 1967 and was not a national of the United States.

The Court agrees with defendant's argument that to allow plaintiff to challenge his renunciation some twenty years after the fact is contrary to public policy. It places a tremendous burden on the government to produce witnesses years after the relevant

---

**4.** The statute states in pertinent part:
"Whenever a diplomatic or consular office of the United States has reason to believe that a person while in a foreign state has lost his United States nationality ... he shall certify the facts upon which such belief is based to the Department of State, in writing, under regulations prescribed by the Secretary of State. If the report of the diplomatic or consular officer is approved by the Secretary of State, a copy of the certificate shall be for-

warded to the Attorney General, for his information, and the diplomatic or consular office in which the report was made shall be directed to forward a copy of the certificate to the person to whom it relates."

**5.** Section 1503(a) is inapplicable to those seeking a declaration of citizenship while engaged in deportation proceedings. As this was the plaintiff's situation in *Garcia,* the limited discussion of section 1503(a) found in the case is dictum.

events and to preserve documentation indefinitely. Moreover, a reasonable statute of limitations period serves the important function of mandating a review of the issuance of the CLN when the relevant events are fresh in the minds of the participants. However, it is the responsibility of Congress, not the courts to legislate. The Court cannot distort the plain meaning of a statute in order to achieve a specific result, however desirable. As Judge Becker stated in *Whitehead, supra,* at 120, n. 5, "[The Court] is uncertain that Congress intended that claims could be brought under 1503 such a long time after the loss of citizenship; however, [it] believes that the statutory language compels that interpretation, and [it] observes that it is for Congress to amend the statute if it objects to the result."

## B. Voluntary and Intentional Renunciation

Having found that plaintiff's action is not barred by the statute of limitations, the Court must proceed to the merits. The Secretary contends that even considering the facts as they are presented by plaintiff, defendant is entitled to judgment as a matter of law as plaintiff has not shown that his renunciation of citizenship was involuntary or unintentional. Plaintiff, in opposition, presents facts which he contends are genuine issues of material fact in dispute which would render summary judgment inappropriate.

As with all motions for summary judgment, the Court must view the facts in a light most favorable to the nonmoving party; in this case that is the plaintiff. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If, in this light, there is "no genuine issue as to any material fact" and the moving party has shown that he "is entitled to a judgment as a matter of law", then summary judgment should be granted. Rule 56(c), Federal Rules of Civil Procedure.

It is important to note, however, that *presentation* of disputed facts, alone, is not sufficient to survive summary judgment. The disputed facts must be materi-

al; they must be facts which are capable of effecting the outcome of the case. More important with respect to this case, the disputed facts must be genuine. An issue is genuine for purposes of summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). It is not the function of the court on summary judgment to weigh the evidence and determine credibility, but rather to determine if there is "a need for a trial ... [if] there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party ... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted).

■ With this standard in mind, the Court further notes that a suit pursuant to 8 U.S.C. § 1503(a) is not one for judicial review of an agency decision, but rather requires the district court to determine, *de novo,* the status of the plaintiff as a United States national. *Richards v. Secretary of State,* 752 F.2d 1413, 1417 (9th Cir.1985). Such review requires the Court to determine if the two elements of a valid renunciation exist: 1) that the expatriating act was performed voluntarily; and 2) with the specific intent to relinquish citizenship. *See Vance v. Terrazas,* 444 U.S. 252, 270, 100 S.Ct. 540, 550, 62 L.Ed.2d 461 (1979).

■ The Court begins with an examination of the evidence presented by plaintiff to support his contention that the renunciation was involuntary. In order to survive the motion for summary judgment, plaintiff must overcome a presumption that the expatriating act was performed voluntarily. *See Id.* Proof of duress may serve to rebut this presumption and establish involuntary renunciation. However, after a careful review of the plaintiff's evidence, the Court concludes that there is insufficient evidence to defeat the presumption in favor of voluntary renunciation.

First, it is noted that the only evidence presented by plaintiff to defeat the Secretary's motion is his own self-serving declarations and the testimony presented by his father. While plaintiff lists twenty-four material facts he alleges are in dispute, many are irrelevant, illogical, and repetitious. Thus, many of these "facts" are not genuine and do not prevent a findings in favor of defendant.

Plaintiff has presented his own testimony that he was raised to obey the commands of his father without question. However, there is evidence that plaintiff did act on his own in some critical areas. First and foremost, plaintiff registered for the draft without discussing the matter with either of his parents. Transcript of Board of Appellate Review Hearing at 51–52 ("Tr."). Moreover, the Court notes some glaring inconsistencies in the evidence presented by plaintiff with respect to the influence that his father actually exerted over him. For example, plaintiff claims that he "was raised in a traditional Spanish family in which his father's word was final." Plaintiff's Disputed Material Facts at 3. However, he also maintains that "[b]efore renouncing his citizenship, [he] asked his father repeatedly whether he had to go through with this action." *Id.* at 12. A "final" word would not appear to permit such dissension. Plaintiff could not have accepted his father's word as final if he repeatedly challenged his father's decision on renunciation.

In addition, plaintiff's father wanted very much for him to perform well in high school so that he might be accepted by certain colleges. He admits that his high school academic record fell far short of his father's expectations. Instead of studying diligently as his father demanded, plaintiff admits that he concentrated on girls and on having fun. Tr. at 22.

Thus, there is evidence that plaintiff did not always accede to his father's demands. Even if the Court were to accept plaintiff's argument that he was dominated by his father at the time of renunciation, that does not explain why he waited almost twenty years to challenge his loss of citizenship. Plaintiff would have the Court believe that his father's dominance persisted throughout the past two decades. This is not a colorable position.

Moreover, plaintiff claims that he was too young, at the time of renunciation, to defy his father and make his own decision concerning his citizenship. However, he testified that he lived "all through [his] youth and [his] *adult life* up to 1967" in the United States. Tr. at 15 (emphasis added). Thus, during the latter part of his residency in the U.S., plaintiff considered himself to be an adult. If true, he was not a child at the time of renunciation. Indeed, it is undisputed that plaintiff was 18 years and ten months at the time of his renunciation. For these reasons and others, the Court finds that plaintiff has not presented sufficient evidence of his youth and inability to resist familial pressure to raise a genuine issue of fact regarding voluntariness.

The law holds that for a renunciation to be involuntary, plaintiff must have been presented with a "Hobson's Choice" not of his own design. *See Jolley v. I.N.S.*, 441 F.2d 1245 (5th Cir 1971). Plaintiff was not coerced by the threat of law or sanctions to renounce his citizenship. It was *his* desire to renounce in an effort to avoid hurting his family. His choice to follow the wishes of his family, particularly his father, was a voluntary decision and does not render his renunciation involuntary as a matter of law.

■ Alleging that economic duress contributed to his inability to defy his father, plaintiff claims that it was financially impossible for him to remain in New York as he had no adult relatives with whom to live or any marketable skills. Conspicuously absent from this argument, however, is the fact that plaintiff had grandparents who lived in Caracas. Tr. 28. He resided with his grandparents during his stay in Venezuela and proceeded to the embassy from their home. As plaintiff had dual citizenship at this time, he could have remained in Caracas with his grandparents and avoided the economic hardship he alleges he feared. Thus, while it may not have been economi-

cally feasible for plaintiff to remain in the United States alone, there is nothing to suggest that he could not have stayed in Venezuela as an alternative to renunciation. While economic duress may avoid the effect of an expatriating act, the plaintiff's economic plight must be "dire." *See Stipa v. Dulles*, 233 F.2d 551 (3rd Cir. 1956). In this case, plaintiff has not provided sufficient evidence of economic duress to present a genuine issue of fact.

In contrast to the issue of voluntariness, it is incumbent upon the Secretary to show by a preponderance of the evidence that the act of expatriation was done with the required intent. *Vance v. Terrazas*, 444 U.S. 252, 270, 100 S.Ct. 540, 550, 62 L.Ed.2d 461 (1979). However, the oath taken by plaintiff at the time of renunciation is sufficient evidence to meet the Secretary's burden. *See Richards v. Secretary of State*, 752 F.2d 1413, 1421 (9th Cir.1985). The burden then shifts to the plaintiff to show that he did not, at the time of renunciation, intend a permanent loss of citizenship.

Intent is a state of mind which can be proved directly, but reasonable inferences can also be drawn from other facts and circumstances in evidence which may bear on the issue. Plaintiff's intent regarding renunciation can only be determined by an examination of all of the facts and circumstances surrounding his loss of citizenship. First, and probably most important to this examination, is the fact that plaintiff signed two documents—his own executed statement and the oath of renunciation—which clearly state his intention to permanently renounce his citizenship. Plaintiff's written renunciation contains the statement that the seriousness of the act "and its consequences have been explained and understood by me." Defendant's Exhibit 1. Additionally, the oath of renunciation signed by plaintiff states that "I hereby absolutely and entirely renounce my United States nationality." Defendant's Exhibit 2. These statements should have raised a question regarding the permanency of renunciation in the mind of a reasonable person. Plaintiff's protestations to the contrary almost twenty years later do not raise a genuine issue for a trier of fact.

Secondly, plaintiff admits that the Vice-Consul, prior to accepting the renunciation, explained that loss of citizenship would be permanent. It is undisputed that plaintiff heard the Vice-Counsel and understood the concept. He acknowledges that it was substantially different from what his father had led him to believe. Yet, the undisputed evidence discloses that he sought no clarification from the embassy official or, indeed, from his father when they returned to a waiting area to await finalization of the renunciation documents. Yet, plaintiff claims that he chose to believe his father over the Vice-Consul. His explanations for this decision, however, are conflicting. In his testimony before the Board of Appellate Review, plaintiff claims that he believed his father because he did not know or trust the Vice-Consul, while in his Statement of Material Facts in Dispute at 21, he claims that he did not trust the Vice-Consul because "he believed the Vice Consul considered him a draft-dodger."

Finally, the Court takes note of the fact that plaintiff waited over nineteen years to announce that his renunciation was unintentional. He explains this lengthy delay by stating that he did not think that any one would believe that he unintentionally renounced his citizenship. He asserts that in December 1985 he was finally convinced by friends to challenge the CLN.

Undisputed evidence discloses that plaintiff left his parents in 1970, moved to England to attend college, and received Bachelor and Master of Arts degrees from Cambridge University in architecture. And yet, according to his own self-serving declaration, it was only when the matter was discussed with friends almost twenty years later, he seriously thought about challenging his loss of citizenship.

Considering all of the facts and circumstances, the Court concludes that plaintiff has not raised a genuine issue of material fact concerning his intent at the time of renunciation. There is simply no evidence, beyond plaintiff's self-serving and, at times, contradictory declarations submitted more than twenty years after the act that

he never intended to permanently renounce his United States citizenship. Accordingly, as plaintiff has failed to present a genuine issue of material fact regarding the voluntary and intentional nature of his renunciation, the Secretary is entitled to summary judgment.

## CONCLUSION

For the reasons discussed above, the Court concludes that while the statute of limitations does not prevent the Court from hearing plaintiff's challenge to the issuance of his CLN, defendant has demonstrated that there are no genuine issues of material fact in dispute and summary judgment in favor of defendant is appropriate. An Order consistent with this Memorandum Opinion will issue.