Eugene M. PARNESS, Plaintiff,

v.

George SHULTZ, Secretary of State, and the United States Department of State, Defendants.

Civ. A. No. 86–1456.

United States District Court, District of Columbia.

July 23, 1987.

Israel Teitelbaum, Washington, D.C., James M. Hartmann, New York City, for plaintiff.

George P. Williams, Asst. U.S. Atty., Washington, D.C. for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Eugene M. Parness seeks a declaratory judgment from this Court establishing that he has retained his United States citizenship. The parties agree that the sole issue in this case is whether Parness voluntarily and intentionally relinquished his U.S. citizenship when he signed naturalization papers to become an Israeli citizen in 1973, as a result of which he acquired Israeli citizenship in 1974. For the reasons set forth below, plaintiff's prayer is granted.

■■■ United States citizenship is a precious right and its loss is often attended by dire consequences. *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536–37, 5 L.Ed.2d 551 (1961). The privilege of citizenship, when acquired by birth in the United States, is not easily lost. Under the fourteenth amendment, "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States. U.S. Const. amend. XIV, § 1. Congress has no power to "restrict the effect of birth" protected under the citizenship clause of the fourteenth amendment. *United States v.*

*Wong Kim Ark,* 169 Wheat. 649, 703, 18 S.Ct. 456, 42 L.Ed. 890 (1898). Natural born citizens have a constitutional right to retain their status unless they voluntarily relinquish citizenship. *Afroyim v. Rusk,* 387 U.S. 253, 268, 87 S.Ct. 1660, 1668, 18 L.Ed.2d 757 (1967).

Parness claims that he did not read the naturalization application he signed to become an Israeli citizen, which states that he renounced his allegiance to the United States. *See* Defendant's Exhibit ("DX") O. The government claims that when he signed the document, plaintiff committed an act of expatriation and voluntarily and intentionally relinquished his right to U.S. citizenship. Both parties have agreed that this Court has jurisdiction to make a *de novo* judicial determination of the status of the plaintiff as a United States national and to grant corresponding declaratory relief if appropriate.

### I.

Parness was born in Milwaukee, Wisconsin in 1935, the son of Russian immigrants. He lived in Milwaukee with his parents for the first seventeen years of his life. In the fall of 1952, Parness' parents were murdered. With the help of family and friends, Parness finished high school and in the fall of 1953 left the United States for a year with a youth study group in Israel. He has continued to live in Israel for all of his adult life. To safeguard his citizenship in America, however, Parness periodically and repeatedly registered with the United States Embassy in Israel, from the time of his arrival in 1953 through 1968.

In the late 1960s, Parness heard that because of a change in United States law, U.S. citizens could no longer lose their citizenship by engaging in what had been expatriating actions in the past: serving in the Israeli Armed Forces, voting in Israel, and becoming an Israeli citizen. In 1966, the Supreme Court of the United States had decided *Afroyim,* which held that U.S. citizenship could not be revoked absent proof of voluntary renunciation of that citizenship. According to his testimony, Parness understood that he could be a citizen

of both Israel and the United States. He relied on this understanding of the law and, as a consequence thereof, engaged in activities which are central to his case.

Parness, who from 1953 through the 1960s had consistently refused to serve in the Israeli military, joined the Israeli military forces for 55 days in 1970 and also served in the Yom Kippur War of 1973. He ceased his earlier practice of registering at the United States Embassy after 1968. Following the Yom Kippur War, he sought to vote in an Israeli election. He incorrectly assumed that service in the Israeli military had made him an Israeli citizen. He was barred from voting and thereafter advised to apply for Israeli naturalization. Parness testified that he decided to be naturalized as an Israeli citizen because of the impact the war had had on him, because he knew his three sons would eventually serve in the Israeli military, and because it was important for them and important to him that he be a citizen of Israel. He had a position managing several industries, felt social pressures, and wanted to take on the responsibilities of Israeli citizenship. In December 1973, Parness went to the Ministry of Defense office in Afula, Israel to file an application for Israeli citizenship. He was 38 years old, married to an Israeli citizen, the father of three sons born in Israel, and he had an American high school education. Parness testified that he did not even consider the possible impact of his application for Israeli citizenship on his United States citizenship.

Under the Nationality Law of Israel at that time, an adult who wished to become an Israeli citizen must have settled or intended to settle in Israel, must have spent three of the preceding five years living in Israel, and must have renounced any prior nationality, Plaintiff's Exhibit ("PX") 1, Nationality Law of Israel § 5(a) (1952). A person could, however, be exempted from section 5(a) requirements if that person had served in the Israeli Army or married an Israeli citizen, according to the unrefuted trial testimony of Ben Zion Eliash, an expert in Jewish law. Eliash testified that, under Section 7 of the 1952 Nationality Law, Parness was automatically eligible to become an Israeli citizen without renouncing U.S. citizenship because of his marriage to an Israeli woman. Eliash testified that under section 6(a)(1) of the same law, Parness was similarly eligible for an exemption from the section 5(a) requirements because of his Israeli military service. Despite his automatic eligibility, and for whatever reason, Parness neither sought nor was given an exemption in his 1973 application.

To fully appreciate plaintiff's testimony, it is essential to envision the setting in which he applied for Israeli citizenship. This is the critical time when the government contends Parness specifically intended to renounce his citizenship. After standing in a long line at the Ministry of Defense in Afula, Parness stood at a clerk's counter to give oral answers to the clerk's questions as the clerk filled in his application form. Parness testified that he responded to what he was asked and did no more, that he was never told he would have to renounce his U.S. citizenship, that he did not knowingly or intentionally renounce his citizenship, and that he did not read the naturalization application, which stated in preprinted text that he renounced his citizenship. Parness further testified that he did not cross out a section of the application in which he could have exercised his right to an exemption from the section 5(a) requirements, nor does he know who did. Parness acknowledges that he should have read the document but contends that his obvious carelessness did not result from indifference to the possibility, or knowledge, that he might lose his U.S. citizenship. His "normal or average reaction to a standard document" was to not take the time to read what the document said. He treated his naturalization application in a manner consistent with his normal practice.

The unusually casual way in which Parness applied for Israeli citizenship closely parallels the manner in which the form was completed by the Israeli ministry clerk. *See* DX–0. The application is clearly incomplete, inaccurate, and has not been signed by any Israeli official or representative. Portions of the application designed

to establish eligibility for Israeli citizenship were left unanswered. The clerk never indicated how long Parness had lived in Israel over the course of the past five years. The clerk never designated whether Parness planned to settle or had settled in Israel. Throughout the document, as translated, Parness is spelled with one "s," as "Parnes." Neither Parness nor the Israeli ministry clerk dignified the document with an attitude more than casual. In March 1984, Parness' application for Israeli citizenship was accepted, and he signed an oath of allegiance to Israel. *See* DX–P. The oath made no mention of renunciation of other citizenship. Thereafter, Parness voted in Israeli elections and traveled with an Israeli passport. Confident that he was a dual citizen of both the United States and Israel, in February 1979, Parness decided to renew his U.S. passport. Since he traveled frequently in his capacity as senior sales manager for a kibbutz, he could travel more easily and to more countries on that passport. Parness testified that it was at this time that he first learned his Israeli citizenship might have voided his U.S. citizenship. Parness' application for U.S. passport renewal was denied after he told U.S. Embassy officials that he had become an Israeli citizen. He was advised that he would have to provide further documentation before his application would be reconsidered.

Parness immediately set out to protect his rights and the rights of his three sons. Two of these sons were granted U.S. citizenship status in 1980. A third son was barred from becoming a U.S. citizen for technical reasons unrelated to this case. Parness complied with requests for documentation in a continuing effort to have his U.S. citizenship assured. In February 1980, the U.S. Embassy prepared a document which Parness signed and in which he acknowledged that he had acquired Israeli citizenship in 1974. He crossed out a phrase in this document which stated that he intended to renounce his U.S. citizenship. *See* DX–V. After reviewing all documentation, including a questionnaire which Parness completed, the State Department concluded that Parness ceased to be a U.S. citizen in 1974, at the time he acquired Israeli citizenship. The State Department then issued Parness a Certificate of Loss of Nationality on May 29, 1981. Once again, in 1984, when he returned to Milwaukee, Wisconsin for his birth certificate, he made another, but equally unsuccessful attempt to obtain a U.S. passport.

Although Parness is now the managing director of sales for his kibbutz, he has operated and continues to operate his personal life with a remarkable degree of trust and naivete. While he has told this Court that he does not believe affirmation of his United States citizenship will affect his Israeli citizenship, he admits that he has not investigated the matter, despite the troubles he has encountered in this case. The file in this case indicates that at least one Israeli consular official has determined that Parness is not exempt from the foreign citizenship renunciation requirement of Israel's Nationality Law. *See* DX–R. However, Parness has consistently maintained that he never intended to renounce his U.S. citizenship, and a State Department official, in a memorandum for the file dated July 10, 1984, *see* DX–FF, acknowledged that Parness' actions do not clearly show an intent to renounce citizenship, and suggested that while "the decision reached at that time was correct" the passage of time "makes me now consider, under our present thinking, that Mr. Parness' loss of nationality might be reversed." The official notes, "At no time did he seek the advice of any U.S. official regarding the consequences of his naturalization as an Israeli citizen."

Parness' actions show merely that he persistently failed to investigate all of his options and to act with utmost care in handling the more important transactions of his personal life. The evidence is compelling that Parness never intended to expatriate himself.

## II.

In 1966, through *Afroyim*, it was established that the government had no power under the Constitution to "rob a citizen of his citizenship without his consent." 387

U.S. at 263. In *Afroyim*, the Supreme Court held that Congress may not exercise any power to divest a person of U.S. citizenship without first showing that the person voluntarily renounced allegiance to the United States. The *Afroyim* decision overruled *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), which recognized a general government power to take away a person's citizenship without that person's consent. The plaintiff in *Afroyim* was a naturalized Polish-American who was stripped of his citizenship under the U.S. Nationality Act of 1940 because he had voted in an Israeli election in 1951. His citizenship was restored in a reversal of a lower court's denial of his motion for declaratory judgment.

The Supreme Court extended the *Afroyim* rule in *Vance v. Terrazas*, 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980), to include a requirement that the government prove by a preponderance of evidence that a person had a specific intent to renounce his or her citizenship. The Court held that the government may not rest its case on mere evidence that a person had voluntarily committed an expatriating act. It was the government's burden to prove that the acts were committed with a specific intent to renounce citizenship and to demonstrate this by a preponderance of the evidence. *Id.*, at 253, 100 S.Ct. at 541–42.

Under the Immigration and Nationality Act, a United States national may lose his or her nationality by committing an act of voluntary expatriation listed in the statute. Section 349(a)(2) & (c), *as amended*, 8 U.S.C. § 1481 (Supp.1987). The statute lists the following, among others, as expatriating acts: applying for and obtaining naturalization in a foreign state while an adult; serving as an officer with the armed services of a foreign state; making a formal renunciation of nationality before a United States consular officer or diplomat; or making a formal renunciation of citizenship in writing in the United States in wartime. Section 1481(a). After *Vance*, however, these acts by themselves are insufficient to show specific intent. In that case, a dual citizen of Mexico and the United States had expressly stated that he renounced his U.S. citizenship. On remand, the District Court held for the government, applying the test set out by the Supreme Court and finding that the preponderance of the evidence showed that plaintiff intended to lose his United States citizenship. *Terrazas v. Muskie*, 494 F.Supp. 1017, 1020 (N.D.Ill.1980). The Court of Appeals for the Seventh Circuit affirmed, noting that circumstantial evidence surrounding a voluntary act may be used to establish intent and that the circumstantial evidence showed intent to renounce citizenship. The Court further stated that the government had the burden to show that at the time of the alleged expatriating act the person intended to renounce citizenship, and to show this by a preponderance of the evidence. *Terrazas v. Haig*, 653 F.2d 285, 288 (7th Cir.1981) (per curiam).

■ Like the instant one, citizenship cases are generally fact specific and can only be decided after scrutiny of the evidence at trial. *See, e.g., Richards v. Secretary of State*, 752 F.2d 1413 (9th Cir.1985); *Kahane v. Shultz*, 653 F.Supp. 1486, 1493 (E.D.N.Y. Feb. 21, 1987).

■ In this case, acts, omissions, and statements of Parness strongly exhibit that his gross negligence endangered his U.S. citizenship; he has suffered the consequences of his casual attitude. Nonetheless, the government has failed to show, as it must, by a preponderance of the evidence, that Parness ever specifically intended to relinquish his U.S. citizenship. Parness' overall testimony has been highly credible and most persuasive. His demeanor, his responsiveness to examination, his obvious sincerity, and his general conduct all clearly demonstrate that he never had specific intent to renounce his U.S. citizenship. The circumstances of his application for Israeli citizenship were unique; the testimony and much documentation in this case support plaintiff's position. The Court cannot conclude on these facts that Parness knowingly, intelligently, and intentionally renounced his U.S. citizenship.

■ This Court need not decide whether an award of attorneys' fees and costs, as

prayed for, would be otherwise appropriate in this action, since the plaintiff's conceded negligence led to this litigation and the expenses incurred thereby.

Accordingly, Eugene M. Parness, native-born, is declared to be a citizen of the United States of America, entitled to all rights and privileges pertaining thereto.

IT IS SO ORDERED.