**William Anthony RICHARDS,**
**Plaintiff-Appellant,**

v.

**SECRETARY OF STATE, DEPARTMENT OF STATE, United States of America, Defendants-Appellees.**

No. 82–5991.

United States Court of Appeals,
Ninth Circuit.

Argued Sept. 9, 1983.

Submitted Nov. 21, 1983.

Decided Feb. 4, 1985.

David Leung, Santa Ana, Cal., for plaintiff-appellant.

Ronald K. Silver, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellees.

Before HUG and REINHARDT, Circuit Judges, and PANNER,* District Judge.

REINHARDT, Circuit Judge:

■ William Anthony Richards was issued a Certificate of Loss of Nationality by the Department of State ("the Department") on June 22, 1978. The Department found that he had expatriated himself on February 23, 1971, when he became a citizen of Canada and, in doing so, took an oath of allegiance to the Queen of England and expressly renounced allegiance to any other sovereign. Richards brought this suit seeking a declaration that the procedures the Department used in issuing the Certificate violated the due process, equal protection, and bill of attainder clauses of the Constitution. U.S. Const. amend. V;[1]

---

* Honorable Owen Murphy Panner, United States District Judge for the District of Oregon, sitting by designation.

1. The due process clause of the fifth amendment imposes on the federal government the limitations that the equal protection clause of the fourteenth amendment, U.S. Const. amend. XIV, § 1, imposes on the states. *See Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); *Weinberger v. Wiesenfeld,* 420 U.S.

U.S. Const. art. I, § 9, cl. 3. He also sought a declaration that he is a citizen of the United States. The district court declined to reach the constitutional claims, finding that a *de novo* trial to determine whether or not he is a United States citizen would provide him full relief. The district court conducted such a trial and concluded that Richards is not a United States citizen. Richards appeals. We affirm.

## FACTS

William Anthony Richards acquired United States citizenship when he was born in San Luis Obispo, California, on September 13, 1938. He received a Bachelor of Arts degree from the University of Southern California in 1964, and, in 1965, he left the United States and established residence in Canada. He taught school in Vancouver, British Columbia, until 1969.

In 1969, Richards applied for employment with the Boy Scouts of Canada. He was informed that employees must either be Canadian citizens or have declared an intention to acquire Canadian citizenship upon becoming eligible. As Richards was not a Canadian citizen, he was employed only after he declared his intention to become one.

Less than two years later, Richards became eligible for Canadian citizenship. He applied for and was granted Canadian citizenship on February 23, 1971. On that date, he signed the following Declaration of Renunciation and Oath of Allegiance:

I HEREBY RENOUNCE ALL ALLEGIANCE AND FIDELITY TO ANY FOREIGN SOVEREIGN OR STATE OF WHOM OR WHICH I MAY AT THIS TIME BE A SUBJECT OR CITIZEN. I SWEAR THAT I WILL BE FAITHFUL AND BEAR TRUE ALLEGIANCE TO HER MAJESTY QUEEN ELIZABETH THE SECOND, HER HEIRS AND SUCCESSORS, ACCORDING TO LAW, AND THAT I WILL FAITHFULLY OBSERVE THE LAWS OF CANADA AND FULFIL MY DUTIES AS A

636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43

CANADIAN CITIZEN SO HELP ME GOD.

In March, 1971, Richards obtained a Canadian passport, which he used when he returned to the United States in 1972 for graduate study. He registered as a foreign student at the University of Southern California. In 1973, he returned to Canada where he worked as a school teacher until 1975. He then became a freelance writer and trail guide.

In March, 1976, he applied for and received a new Canadian passport, which he used when he travelled to Ireland later that year. He married a Canadian citizen in April, 1976, and the following month he visited the United States Consulate General at Vancouver ("the Consulate") to file visa petitions for his wife and step-children. It was at that point that United States authorities first became aware of Richards' naturalization in Canada.

After Canadian authorities confirmed that Richards had obtained Canadian citizenship, the Consulate prepared a Certificate of Loss of Nationality and forwarded it to the Department for approval. The Department instructed the Consulate to invite Richards to execute an "affidavit of expatriated person." It further instructed the Consulate that, if Richards refused to execute such an affidavit, the Consulate should send him by registered mail a "preliminary finding of loss of nationality letter." The letter was to inform Richards that he may have lost his United States nationality, and it was to notify him that he had 30 days in which to present any evidence to support any contention that he did not intend to relinquish his United States citizenship when he became a Canadian citizen. The Consulate prepared the letter but was unable to locate Richards. The Department then retired Richards' case to inactive status without approving the Certificate of Loss of Nationality.

On December 2, 1977, Richards visited the Consulate for the purpose of determin-

L.Ed.2d 514 (1975).

ing his citizenship status.[2] He was asked to complete questionnaires relating to his Canadian citizenship and his intent to relinquish his United States citizenship. He submitted the forms on December 6. He was also interviewed by a consular official. Based on the completed questionnaire and the interview, the Consulate determined that Richards had lost his United States citizenship. It sent the Department a letter summarizing the reasons behind its conclusion. The Department then approved the Certificate of Loss of Nationality, which was issued on June 22, 1978, and delivered to Richards in California, where he had returned in December of 1977. His marriage ended in divorce in July of 1978.

Richards appealed to the Department's Board of Appellate Review. He argued that the statutes and regulations authorizing the issuance of Certificates of Loss of Nationality are invalid and void because they deny him due process and equal protection of the laws. U.S. Const. amend. V; see supra note 1. He also argued that the statute authorizing the issuance of the Certificate without a prior judicial trial, 8 U.S.C. § 1501 (1982), constitutes a bill of attainder. U.S. Const. art. I, § 9, cl. 3. Finally, he argued that the Department's conclusion that he had lost his United States citizenship was erroneous. Richards waived his right to a hearing before the Board.

The Board determined that it lacked jurisdiction to consider Richards' constitutional arguments. It then rejected all of Richards' other arguments. It concluded that Richards had lost his United States citizenship upon becoming a Canadian citizen.

Richards then instituted this suit. Seeking a declaratory judgment, he again argued that the procedures used by the Department in issuing the Certificate violate the due process, equal protection, and bill of attainder clauses. He also sought a declaration that he is a United States citizen.

The district court declined to address the constitutional claims. It believed that Richards would receive full relief if the court conducted a de novo trial on whether he is or is not a United States citizen. The court then proceeded to conduct such a trial. It concluded that Richards lost his United States citizenship when he voluntarily and with specific intent to renounce his United States citizenship became a Canadian citizen and took an oath of allegiance to Canada.

## DISCUSSION

### I. Richards' Citizenship Status

Richards seeks a declaratory judgment under 8 U.S.C. § 1503(a) (1982). That section authorizes, with certain exceptions inapplicable here, any person within the United States who has been denied a right or privilege on the ground that he is not a national of the United States to institute a declaratory judgment action to determine whether he is a national of the United States. A suit under section 1503(a) is not one for judicial review of the agency's action. Rather, section 1503(a) authorizes a de novo judicial determination of the status of the plaintiff as a United States national. Because Richards has been issued a Certificate of Loss of Nationality, the district court had jurisdiction.

### A. Background

In *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), the Supreme Court held that the government has no power to take away United States citizenship. The Court overruled its hold-

2. There is some question concerning the purpose of Richards' 1976 visit to the Consulate. In the text, we have set forth the explanation he offered in his brief on appeal. During his trial, however, he testified that he had a dual purpose in visiting the Consulate in 1976: (a) he wished to inquire about visa petitions for his wife and step-children, and, (b) as a result of a discussion at a dinner party concerning the legal effect of his acquisition of Canadian citizenship, he wished to inquire about his United States citizenship status. It is irrelevant to the issue before us whether he inquired about his United States citizenship status in 1976 as well as in 1977.

ing in *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), that such a power is encompassed in the government's implied power to conduct the nation's foreign affairs. Recognizing that in other nations the government has the power to strip people of their citizenship, the Court held in *Afroyim* that "[i]n our country the people are sovereign and the government cannot sever its relationship to the people by taking away their citizenship." 387 U.S. at 257, 87 S.Ct. at 1662. The Court held that a United States citizen possesses "a constitutional right to remain a citizen ... unless he voluntarily relinquishes that citizenship." *Id.* at 268, 87 S.Ct. at 1668.[3]

In *Vance v. Terrazas*, 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980), the Supreme Court elaborated on the "voluntary relinquishment" proviso. It rejected the Secretary of State's argument that a citizen loses his citizenship simply by voluntarily performing an act that Congress has designated an expatriating act. The Court stated that a person loses his citizenship only if he intends to relinquish his citizenship, "whether the intent is expressed in words or is found as a fair inference from proved conduct." 444 U.S. at 260, 100 S.Ct. at 545. "In the last analysis," the Court said, "expatriation depends on the will of the citizen rather than on the will of Congress and its assessment of his conduct." *Id.*

■ Under *Terrazas*, a person loses his United States citizenship if he voluntarily performs one of the expatriating acts enumerated by Congress *and* if, in performing that act, he intends to relinquish his citizenship. Under 8 U.S.C. § 1481(c) (1982), the government has to show voluntariness and specific intent only by a preponderance of

the evidence. That section also provides that

> any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

There is thus a presumption of voluntariness. There is no presumption, however, that the expatriating act was performed with the intent to relinquish citizenship. *Vance v. Terrazas*, 444 U.S. 252, 268, 100 S.Ct. 540, 549, 62 L.Ed.2d 461 (1980). Both the preponderance of the evidence standard and the presumption of voluntariness have been held to be constitutionally permissible. *Id.* at 264–70, 100 S.Ct. at 547–50.

### B. *Voluntariness*

■ The district court below held that the Secretary was required to show the voluntariness not only of the expatriating acts—in this case, the obtaining of Canadian citizenship, *see* 8 U.S.C. § 1481(a)(1), and the taking of an oath of allegiance to Canada, *see* 8 U.S.C. § 1481(a)(2) [4]—but also of the acts demonstrating an intent to renounce United States citizenship. We agree. Showing the voluntariness of the latter acts is, we think, a necessary part of showing the alleged expatriate's specific intent to relinquish his citizenship.

■ The district court also said that the statutory presumption of voluntariness applies not only to expatriating acts, but also to acts demonstrating specific intent to relinquish citizenship. That, we think, was erroneous. The statutory presumption of voluntariness by its terms applies only to

---

**3.** The constitutional protections described in *Afroyim* apply at least to all persons "born or naturalized in the United States." *See Rogers v. Bellei*, 401 U.S. 815, 834–35, 91 S.Ct. 1060, 1070–71, 28 L.Ed.2d 499 (1971).

**4.** Richards argues that we cannot rely on his taking of the oath in determining whether he has lost his citizenship because the Department

relied only on his acquisition of Canadian citizenship when it issued the Certificate of Loss of Nationality. We think his argument lacks merit. As we have said, the district court was not reviewing the Secretary's action; it was conducting a *de novo* trial on whether Richards had or had not voluntarily relinquished his United States citizenship. *See supra* at 1417.

"any act of expatriation under the provisions of this Chapter or any other Act." 8 U.S.C. § 1481(c) (1982). Moreover, the Supreme Court held explicitly in *Terrazas* that there is no presumption of specific intent to relinquish citizenship. 444 U.S. at 268, 100 S.Ct. at 549. It follows, we think, that there is also no presumption of voluntariness with respect to the acts demonstrating a specific intent to relinquish United States citizenship.

■ Nevertheless, the district court's application of the presumption in this case was not erroneous. Here, the act that the Secretary alleges demonstrates a specific intent to relinquish United States citizenship—i.e., the explicit renunciation of United States citizenship under oath—was an integral part of both of the alleged expatriating acts—i.e., becoming a Canadian citizen and taking an oath of allegiance to Canada. Because the presumption of voluntariness extended to both of those acts, it also of necessity applied to the act demonstrating specific intent.

Richards does not deny that he became a Canadian citizen or that he took an oath of allegiance to Canada containing an explicit renunciation of United States citizenship. He argues, however, that his acts were not voluntary because he was under economic duress when he performed them. The district court held that Richards failed to rebut the presumption that the acts were performed voluntarily. We think the district court's conclusions were amply supported. In the alternative, we conclude that even without the benefit of any presumption the Department established the voluntariness of Richards' acts, including his explicit renunciation of United States citizenship, by a preponderance of the evidence.

■ We agree with Richards' argument that an expatriating act cannot be said to have been performed voluntarily if it was performed under conditions of economic duress. *See Stipa v. Dulles*, 233 F.2d 551 (3d Cir.1956); *Insogna v. Dulles*, 116 F.Supp. 473 (D.D.C.1953). Conditions of economic duress, however, have been found under circumstances far different from those prevailing here. In *Insogna v. Dulles*, for instance, the expatriating act was performed to obtain money necessary "in order to live." 116 F.Supp. at 475. In *Stipa v. Dulles*, the alleged expatriate faced "dire economic plight and inability to obtain employment." 233 F.2d at 556. Although we do not decide that economic duress exists only under such extreme circumstances, we do think that, at the least, some degree of hardship must be shown. The district court in this case found that Richards was under no hardship of any kind when he executed the documents containing the renunciation of United States citizenship. We can conclude that the Richards' renunciation of United States citizenship was involuntary only if the district court's finding in that regard was clearly erroneous.

■ The district court's finding that Richards was not under any economic hardship when he renounced his United States citizenship was not clearly erroneous. Richards points out that the renunciation was a requirement for obtaining Canadian citizenship and that obtaining Canadian citizenship was, in turn, a requirement for retaining his job. However, Richards was employed as a school teacher when he decided to accept the Boy Scouts job and was fully aware of the fact that he would have to become a Canadian citizen in order to retain his new position. He had been a teacher for several years, and does not contend that he was forced to leave his teaching job. Moreover, it does not appear that, upon becoming aware that he would have to renounce his United States citizenship in order to acquire Canadian citizenship, Richards made any attempt to obtain employment that would not require him to renounce his United States citizenship. Nor does it appear, based on his past employment history in Canada, that such an attempt would have been futile. Finally, Richards was unmarried at the time he renounced his United States citizenship, and there was no evidence that he was under any particularly onerous financial

obligations. In short, the evidence in the record amply supports the district court's finding that Richards became a Canadian citizen purely for the purpose of career advancement. In any event, it falls far short of establishing economic duress.

### C. Specific Intent

■ As we have noted, a person loses his United States citizenship by voluntarily performing an expatriating act only if "the expatriating act was accompanied by an intent to terminate United States citizenship." *Vance v. Terrazas*, 444 U.S. at 263, 100 S.Ct. at 546. This case requires us to determine what state of mind is necessary to relinquish United States citizenship.

■ The Court in *Terrazas* did not define the "intent" that must accompany the expatriating act. The Court's reaffirmance of the principles of *Afroyim*, however, makes it clear that what is required is more than simply the voluntary commission of an act that one knows Congress has designated an expatriating act. In *Afroyim*, the Court stated that "the framers of the [Fourteenth] Amendment ... wanted to put citizenship beyond the power of any governmental unit to destroy." 387 U.S. at 263, 87 S.Ct. at 1665. It said that "[o]nce acquired ... Fourteenth Amendment citizenship was not to be shifted, canceled, or diluted at the will of the Federal Government, the States, or any other governmental unit." *Id.* at 262, 87 S.Ct. at 1665. *Afroyim* thus established the principle that Congress is without power to provide that citizens shall lose their citizenship by performing specified acts.[5]

The *Afroyim* principle was reaffirmed in *Terrazas*, in which the Court stated that, "[i]n the last analysis, expatriation depends on the will of the citizen *rather than on the will of Congress and its assessment of his conduct.*" 444 U.S. at 260, 100 S.Ct. at 545 (emphasis added). If we were to hold that mere knowledge that Congress has designated an act an expatriating act is enough to make out specific intent, we would in effect be recognizing a congressional power to strip persons of their citizenship. Because, under *Afroyim* and *Terrazas*, Congress has no power to declare that the performance of particular acts shall automatically result in expatriation, mere knowledge that Congress has declared an act to be expatriating is not enough. Something more than knowledge that the act is an expatriating act under United States law must be shown.

■ As we read *Afroyim* and *Terrazas*, a United States citizen effectively renounces his citizenship by performing an act that Congress has designated an expatriating act only if he means the act to constitute a renunciation of his United States citizenship.[6] In the absence of such an intent, he does not lose his citizenship simply by performing an expatriating act, even if he knows that Congress has designated the act an expatriating act. By the same token, we do not think that knowledge of expatriation law on the part of the alleged expatriate is necessary for loss of citizenship to result. Thus, a person who performs an expatriating act with an intent to renounce his United States citizenship loses his United States citizenship whether

**5.** In *Terrazas*, the Court stated that "intent to renounce" may be evidenced not only through words but also through conduct. Some expatriating acts may be so inherently inconsistent with United States citizenship that persons performing them may be deemed to intend to relinquish their United States citizenship even in the absence of statements that they so intended the acts, or, indeed, even despite contemporaneous denials that they so intended the acts. *Cf. Terrazas*, 444 U.S. at 261, 100 S.Ct. at 545; *Perez v. Brownell*, 356 U.S. 44, 62–84, 78 S.Ct. 568, 578–89, 2 L.Ed.2d 603 (1958) (Warren, C.J., dissenting). If such is the case, however, there is nevertheless no inconsistency with the proposi-

tion set forth in the text: although performing the act could itself result in loss of citizenship, that would be a consequence of the inherent nature of the act, not the fact that Congress has designated it an expatriating act.

**6.** We need not decide whether United States citizenship can be effectively renounced *only* by performing an act that Congress has designated an expatriating act or, *per contra*, whether there are other, similarly formal, acts that can result in loss of citizenship if performed with specific intent to renounce citizenship.

or not he knew that the act was an expatriating act and, indeed, whether or not he knew that expatriation was possible under United States law.

As the court stated in *Terrazas*, specific intent may be "expressed in words or ... found as a fair inference from proved conduct." 444 U.S. at 260, 100 S.Ct. at 545. The district court found Richards' intent to renounce his United States citizenship expressed in the words of the oath he executed upon becoming a citizen of Canada. Those words were the following:

> I HEREBY RENOUNCE ALL ALLEGIANCE AND FIDELITY TO ANY FOREIGN SOVEREIGN OR STATE OF WHOM OR WHICH I MAY AT THIS TIME BE A SUBJECT OR CITIZEN.

The district court found that Richards knew and understood the words in the documents he was signing. The court found that, at the time he signed the documents, "plaintiff would have preferred to retain American citizenship, and in his mind hoped to do so, but elected to sign the Canadian naturalization documents and accept the legal consequences thereof rather than risk loss of his job or career advancement." The court concluded that his intent to renounce his United States citizenship was "established by his knowing and voluntary taking of the oath of allegiance to a foreign sovereign which included an explicit renunciation of his United States citizenship."

We agree with the district court that the voluntary taking of a formal oath that includes an explicit renunciation of United States citizenship is ordinarily sufficient to establish a specific intent to renounce United States citizenship. We also believe that there are no factors here that would justify a different result. Richards does not contend that he did not mean what he said. Rather, he argues that he lacked the necessary intent because he never had a desire to surrender his United States citizenship. He says, and we accept his statement, that he became a Canadian citizen and renounced allegiance to the United States only in order to retain his employ-

ment. He argues that the crucial question is "Would Richards have applied for Canadian citizenship but for his employment?" Because "there is no evidence that he harbored the desire to become a Canadian citizen independent of his employment," he argues, he lacked the requisite intent.

Richards contends in effect that specific intent is lacking if the person renouncing United States citizenship was motivated either principally or solely by a desire to gain an important advantage that would otherwise have been unavailable to him. His argument plainly lacks merit. Under Richards' theory, a renunciation of United States citizenship would be effective only if motivated by a principled, abstract desire to sever allegiance to the United States. That theory is contrary to all of the case law concerning voluntary expatriation.

In *Terrazas*, the Court established that expatriation turns on the "will" of the citizen. We see nothing in that decision, or in any other cited by Richards, that indicates that renunciation is effective only in the case of citizens whose "will" to renounce is based on a principled, abstract desire to sever ties to the United States. Instead, the cases make it abundantly clear that a person's free choice to renounce United States citizenship is effective whatever the motivation. Whether it is done in order to make more money, to advance a career or other relationship, to gain someone's hand in marriage, or to participate in the political process in the country to which he has moved, a United States citizen's free choice to renounce his citizenship results in the loss of that citizenship.

We cannot accept a test under which the right to expatriation can be exercised effectively only if exercised eagerly. We know of no other context in which the law refuses to give effect to a decision made freely and knowingly simply because it was also made reluctantly. Whenever a citizen has freely and knowingly chosen to renounce his United States citizenship, his desire to retain his citizenship has been outweighed by his reasons for performing an act inconsistent with that citizenship. If a citizen

makes that choice and carries it out, the choice must be given effect.

 Moreover, expatriation has long been recognized as a *right* of United States citizens, not just as a limitation on citizens' rights. *See* Preamble to the Act of July 27, 1868, ch. 249, 15 Stat. 223 ("[T]he right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness."). United States citizens have a right to become aliens. In *Afroyim,* the Court placed the right of voluntary expatriation solidly on a constitutional footing. Under Richards' theory, this constitutional right of voluntary expatriation would extend only to persons acting for public-spirited reasons. A renunciation would be ineffective, for instance, if it was motivated by a desire to avoid the duties of citizenship. We find no support in the cases for such a narrow interpretation of the right of expatriation. In fact, the cases are inconsistent with Richards' view. For instance, courts have generally given effect to expatriations even though their sole or primary purpose may have been the desire to avoid military conscription, *see Jolley v. Immigration and Naturalization Service,* 441 F.2d 1245 (5th Cir. 1971), or to avoid liability for United States taxes, *see United States v. Lucienne D'Hotelle de Benitez Rexach,* 558 F.2d 37, 43 (1st Cir.1977). In sum, we think the case law establishes that an·alleged expatriate's "specific intent" to renounce his citizenship does not turn on his motivation.[7]

 The record supports the district court's conclusions that (a) Richards desired to become a Canadian citizen and (b) he would have liked also to remain a United States citizen, but because (c) Canada required a relinquishment of foreign citizenship as part of its naturalization procedures, (d) Richards chose to renounce his United States citizenship in order to obtain Canadian citizenship. Indeed, Richards so characterized his intentions in the questionnaire he completed and signed under oath at the Consulate on May 11, 1976:

> At the time I was an employee of the Boy Scouts of Canada and felt I should become a citizen of Canada. I didnot [sic] want to relinquish my U.S. citizenship but as part of the Canadian citizenship requirements did so.

Under *Afroyim* and *Terrazas,* we are required to give effect to Richards' free and knowing choice to acquire foreign citizenship and renounce his United States citizenship. Richards has lost his United States citizenship.

## II. *Richards' Constitutional Claims*

 In addition to seeking a declaration of his status as a national, Richards sought a declaration that the procedures by which the Secretary issues Certificates of Loss of Nationality violate the bill of attainder clause, the due process clause of the fifth amendment, and the equal protection clause of the fourteenth amendment. Under the circumstances of this case we do not think the district court abused its discretion when it declined to consider Rich-

---

7. In addition, Congress has recognized that a renunciation of United States citizenship is effective even if motivated primarily in order to avoid payment of United States taxes. In 1966, Congress added a provision to the Tax Code to discourage expatriations for the purpose of avoiding United States taxes. The statute it enacted provides that, with some exceptions, a citizen who renounces his citizenship for the principal purpose of avoiding United States taxes will be treated as a citizen for tax purposes for ten years following his expatriation. *See* 26 U.S.C. § 877 (1982). The statute thus removes much of the incentive for tax-motivated renunciations. However, it does not provide that a tax-motivated renunciation will not result in

expatriation. In fact, it expressly provides that citizens who renounce their citizenship in order to avoid United States taxes become aliens. 26 U.S.C. § 877(a) (1982). Although Congress' interpretation of the right of expatriation is not binding on the courts, *see Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the statute does contribute to what appears to be a general concensus that a renunciation of United States citizenship is not ineffective simply because it was motivated by a desire to avoid the duties of citizenship.

We express no opinion on whether the section 877 is constitutional or, *per contra,* whether it places too great a burden on the right of expatriation.

ards' request for declaratory relief as to his constitutional claims.

CONCLUSION

The district court correctly found that Richards was not a citizen of the United States. He lost his United States citizenship when he voluntarily became a citizen of Canada and took an oath of allegiance to Canada containing an explicit renunciation of his allegiance to the United States. Specific intent to relinquish his United States citizenship was clearly established by that renunciation, even though Richards' motivation was to retain a particular employment position.

AFFIRMED.