**Meir KAHANE, Plaintiff,**

**v.**

**SECRETARY OF STATE and Commissioner, Immigration and Naturalization Service, Defendants.**

**Civ. A. No. 88–3093.**

United States District Court, District of Columbia.

Dec. 6, 1988.

Nathan Lewin, Anne M. Coughlin, Miller, Cassidy, Larocca & Lewin, Washington, D.C., for plaintiff.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for Government.

James E. Hergen, Office of Legal Adviser, Dept. of State, Washington, D.C., for State Dept.

## MEMORANDUM OPINION AND ORDER

BARRINGTON D. PARKER, Senior District Judge:

In this action, plaintiff Meir Kahane, seeks to enjoin officials of the United States Department of State from enforcing a Certificate of Loss of Nationality ("CLN") approved by that agency on October 7, 1988. He also seeks a declaration from this Court that his Oath of Renunciation of his United States citizenship, executed on August 16, 1988, and again on September 16, 1988, was null and void.

Because of a recently enacted Israeli law which provided that only citizens of Israel could be members of the Knesset, plaintiff renounced his American citizenship. However, a later decision by the Israeli Supreme Court ruled that Kahane was ineligible to run for the Knesset. Since his Israel citizenship was no longer politically useful, he sought to revoke his renunciation. When the State Department refused to accept his revocation, plaintiff's counsel filed this civil proceeding seeking preliminary and permanent injunctions, in addition to declaratory relief.

Faced with an impending departure date and travel plans that included consultations with counsel and an extensive speaking tour in the United States, Kahane's counsel filed a motion for a temporary restraining order. After a hearing on October 26, 1988, defendants were temporarily enjoined from preventing plaintiff's entry into the United States and from enforcing the October 7th Certificate of Loss of Nationality.

The matter is presently before the Court on plaintiff's motion for a preliminary injunction. In addition to opposing plaintiff's motion, the government has filed a motion for summary judgment. At this time the Court will only deal with plaintiff's application for preliminary injunctive relief. After full review and for the reasons set forth below, plaintiff's application is denied.

## I. FACTUAL FINDINGS [1]

Plaintiff Meir Kahane was born in New York, New York on August 1, 1932, and became a United States citizen by virtue of his birth. He is a rabbi, an attorney and a well-known public figure. In 1971, Kahane took up residency in Israel and in 1972 became a citizen of that country pursuant to Israel's "Law of Return." Since he moved to Israel, Kahane has been politically active. He founded the Kach Party in 1973 and has headed its ticket in numerous parliamentary elections.

It was not until 1984, that the Kach Party received sufficient votes to gain a seat in the Knesset, Israel's parliament. After Kahane was officially seated in the Knesset in August 1984, the Department of State determined that he had expatriated himself. A CLN was approved on October 2, 1985, by the Department's Director of the Office of Citizens Consular Services, Bureau of Consular Affairs. Kahane challenged the government's finding that by taking a seat in the Knesset he intended to relinquish his American citizenship and filed a civil proceeding for appropriate relief in the United States District Court for the Eastern District of New York. On cross motions for summary judgment, Judge Israel Leo Glasser held that Kahane was still a citizen of the United States. *Kahane v. Shultz*, 653 F.Supp. 1486 (E.D. N.Y.1987). No appeal was taken from Judge Glasser's ruling.

In early 1988, the Knesset passed a law that its members could only be citizens of

---

1. The Court's factual findings are based upon *Kahane v. Shultz*, 653 F.Supp. 1486 (E.D.N.Y. 1987), Kahane's Affidavits (Oct. 27 and Nov. 16, 1988), defendant's exhibits, and Declarations of

Carmen DiPlacido, Director of the Office of Citizens Consular Services, Bureau of Consular Affairs, United States Department of State (Oct. 26 and Nov. 18, 1988).

Israel. On August 16, 1988, Kahane appeared before the United States Consulate in Jerusalem, Israel, and completed an "Oath of Renunciation" containing the following statements:

> I desire to make a formal renunciation of my American nationality, as provided by Section 349(a)(5) of the Immigration and Nationality Act and pursuant thereto I hereby *absolutely and entirely, without mental reservation, coercion or duress,* renounce my United States nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining.

Dx. 1 at 1 (emphasis added).[2] This oath was subscribed and sworn to by Kahane in the presence of Catherine Barry, the American Consulate General at Jerusalem. In addition, Kahane signed a "Statement of Understanding" which read in part:

> I am exercising my right of renunciation freely and voluntarily without any force, compulsion, or undue influence placed upon me by any person.... The extremely serious and irrevocable nature of the act of renunciation has been explained to me by Consul Catherine Barry at the American Consulate General at Jerusalem, and I fully understand its consequences.

*Id.* at 2. Kahane also submitted a supplemental declaration setting forth reasons for renouncing his citizenship:

> I must make all steps possible in order tp [sic] relinquish my United States citizenship because if I do not I will not be able to be a candidate for Knesset. Therefore, I am here today ... to ask that the United States government accept my relinquishing of my U.S. citizenship as I take each and every legal step required by the U.S. government, in compliance with the new Israeli law.... I ask the U.S. government to accept my relinquishment of my citizenship in order that I may, under the new Israeli law, run on a Kach Knesset list that is eligible for this year's Israeli elections.

*Id.* at 3.

The American Consulate General in Jerusalem then prepared a CLN for Kahane and forwarded it to Washington, D.C. On September 13, 1988, however, the Department advised the Consulate General that the Oath of Renunciation was not in the precise form prescribed by the Secretary of State. DiPlacido Decl. at ¶¶ 11–12 (Oct. 26, 1988); Dx. 3. Kahane voluntarily went to the United States Consulate in Jerusalem and executed a second "Oath of Renunciation" on September 16, 1988. At the same time, he completed another "Statement of Understanding" which was identical to the first "Statement of Understanding" and contained language regarding Kahane's free and voluntary action of renunciation that was taken "without any force, compulsion, or undue influence." Dx. 2 at 3. Like the previous form, his signed statement set forth the consequences of the renunciation: "Upon renouncing my citizenship *I will become an alien* with respect to the United States subject to all the laws and procedures of the United States regarding entry and control of aliens." *Id.* (emphasis added).

The Department received Kahane's second renunciation on September 21, 1988, and reviewed it "to ensure that all procedural and substantive considerations were complied with" by plaintiff. DiPlacido Decl. at ¶¶ 12–13 (Oct. 26, 1988). A CLN was approved for Meir Kahane on October 7, 1988. *Id.* at ¶ 13; Dx. 2 at 1.

On October 18, 1988, the Israeli Supreme Court barred the Kach party from running in the November 1988 Israeli election. After that decision was rendered, plaintiff informed the American Consulate General in Jerusalem that "I hereby renounce and withdraw irrevocably my request to renounce my U.S. citizenship." Dx. 4. He also sent a telegram to the Department stating: "I withdraw immediately my renunciation of U.S. Citizenship. My renunciation request [sic] null and void. I wish to retain U.S. citizenship." Dx. 5.

On October 24, 1988, the Consulate General in Jerusalem hand-delivered to an employee of the Kach party a reply to plain-

---

**2.** Defendant's and plaintiff's exhibits will be re- ferred to herein as "Dx." and "Px." respectively.

tiff's October 18, 1988 letter. The reply informed plaintiff, *inter alia,* that the Department had approved his CLN on October 7, 1988; that the loss of his United States citizenship was effective September 16, 1988; that his U.S. passport was invalid and should be returned to the Consulate General; and that he had a right to appeal these determinations. Dx. 6. Later that day, one of the Kach party's employees returned the letter, unopened, to the Consulate. Kahane had written across the face of the envelope: "On Attorney's instructions, I return this unopened. Meir Kahane." Dx. 7. Following those events, plaintiff's counsel applied to this Court for a temporary restraining order and a preliminary injunction. Oral arguments on plaintiff's motions were heard by the Court on October 26 and November 23, 1988.

## II. ANALYSIS

The factors to be considered in determining whether to issue a preliminary injunction are: (1) the likelihood that the moving party seeking the injunction will prevail on the merits of the case; (2) the likelihood that the moving party will be irreparably injured absent an injunction; (3) the possibility of substantial harm to other parties caused by issuance of the injunction; and (4) the public interest in granting the injunction. *National Wildlife Fed'n v. Burford,* 835 F.2d 305, 318 (D.C.Cir.1987).

A preliminary injunction is a drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party. *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). First, Kahane must show a strong likelihood that he will prevail on the merits. Secondly, he must demonstrate irreparable harm and that existing legal remedies are inadequate. *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951–952, 39 L.Ed.2d 166 (1974). The injury must be both certain and great; it must be actual and not theoretical. *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir. 1985). At the same time, the potential

adverse effects upon other parties must be considered. In analyzing the second and third factors, the Court engages in the traditional function of the equity court— balancing "competing claims of irreparable hardship" of the parties. *Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas R.R.,* 363 U.S. 528, 535, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960). Finally, a determination must be made whether an injunction is in the public interest. "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citation omitted).

After weighing these factors, the Court concludes that a preliminary injunction should not issue in this case. Based on the various documents and affidavits presented, the Court cannot conclude that plaintiff has demonstrated that he is likely to succeed on the merits. It appears that only a fully developed trial or presentation would permit a determination as to whether or not Kahane's relinquishment of his United States citizenship was involuntary or that he lacked the intent to renounce his citizenship.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff seeks a declaration that he is still a citizen of the United States. Title 8, § 1503(a) of the United States Code authorizes any person "within the United States"[3] who has been denied a right or privilege on the grounds that he is not a national of the United States to file suit to seek a declaration of his nationality. The statute authorizes a *de novo* judicial determination of the status of the plaintiff as a United States citizen. Because Kahane has been issued a Certificate of Loss of Nationality, this Court has jurisdiction.

Section 1481 of Title 8 sets forth several ways by which a United States citizen can lose his citizenship. The specific provision applicable to plaintiff's situation provides:

**3.** Persons outside the United States may sue under § 1503(a) to establish United States citizenship. *Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962).

(a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality....

(5) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State;
....

8 U.S.C. § 1481(a)(5) (1987). By completing an "Oath of Renunciation" on two separate occasions—August 16, 1988 and September 16, 1988—at the American Consulate in Jerusalem, plaintiff plainly met the "act of renunciation" standard articulated in § 1481(a)(5). It is clear to this Court that plaintiff performed an expatriating act by making a formal renunciation of his American nationality on September 16, 1988, when he completed the precise "Oath of Renunciation" as prescribed by the Secretary of State.

■ The Supreme Court has held, however, that a United States citizen possesses "a constitutional right to remain a citizen ... unless he voluntarily relinquishes that citizenship." *Afroyim v. Rusk,* 387 U.S. 253, 268, 87 S.Ct. 1660, 1668, 18 L.Ed.2d 757 (1967). In *Vance v. Terrazas,* 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461, *reh'g denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980), the Supreme Court elaborated on the "voluntary relinquishment" proviso. A person loses his citizenship only if he voluntarily performs one of the expatriating acts enumerated by Congress in § 1481, and if, in performing that act, he intends to relinquish his citizenship.

■ Under § 1481(c), the government has to show voluntariness and specific intent only by a preponderance of the evidence. That section also provides that:

[A]ny person who commits or performs ... any act of expatriation under the provisions of this or any other Act shall be *presumed to have done so voluntarily,* but such a presumption may be rebutted upon a showing by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

8 U.S.C. § 1481(c) (1987). There is thus a presumption of voluntariness. *See Richards v. Secretary of State,* 752 F.2d 1413 (9th Cir.1985).

Our Circuit has recently adhered to this conclusion that § 1481(c) creates a presumption that the renunciating act was taken voluntarily. *Meretsky v. Department of State,* C.A. 85–1985 (D.D.C. Dec. 30, 1985), *aff'd mem.* 816 F.2d 791 (D.C.Cir. 1987) (American-born lawyer who renounced his citizenship to become eligible for admission to the Canadian Bar, challenged the Department's issuance of a CLN. Relying on the presumption within 8 U.S.C. § 1481(c), the court found that the plaintiff's expatriating act, his oath which explicitly renounced allegiance to all other sovereigns, was taken voluntarily.) There is, however, no presumption of voluntariness with respect to the acts demonstrating specific intent to relinquish United States citizenship. But intent may be "expressed in words or [ ] found as a fair inference from proved conduct." *Terrazas,* 444 U.S. at 260, 100 S.Ct. at 545. Courts have held that the "voluntary taking of a formal oath that includes an explicit renunciation of United States citizenship is ordinarily sufficient to establish a specific intent to renounce United States citizenship." *Richards,* 752 F.2d at 1421; *See Davis v. District Director,* 481 F.Supp. 1178, 1181 (D.D.C.1979) ("A voluntary oath of renunciation is a clear statement of desire to relinquish United States citizenship." The accompanying statement of beliefs complemented the formal oath of renunciation and therefore supplemented the petitioner's clear intent to renounce his citizenship.); *United States v. Matheson,* 532 F.2d 809, 816 (2d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976) ("Had Mrs. Burns wished to expatriate herself she could simply have unequivocally stated that she renounced her American citizenship.").

Plaintiff Kahane argues that he did not voluntarily renounce his United States citizenship, but rather that he was "compelled" to do so given the change in Israeli law requiring that Knesset members may only be citizens of Israel. He characterizes the law as a "gun to my head." Kahane Aff. at ¶ 4 (Oct. 27, 1988).

In addressing the question of whether or not Kahane's expatriating act was voluntary, the Court notes that it is not the first to wrestle with the voluntariness of a renunciation. In *Jolley v. INS*, 441 F.2d 1245 (5th Cir.), *cert. denied*, 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971), plaintiff moved to Canada to avoid the draft, renounced his citizenship, and later when he returned to the United States without a visa, he was ordered to depart voluntarily or be deported to Canada. The Fifth Circuit held that while plaintiff may have abhorred the selective service laws, he could not equate that abhorrence with coercion sufficient to render his renunciation involuntary as a matter of law.

> Dislike for the law does not in and of itself compose coercion; subjective detestation cannot be metamorphosed into duress. Jolley's Hobson's choice, if it be deemed such, was self-generated. The compulsion he felt to renounce his citizenship was of his own design.

*Id.* at 1250. Like Jolley, Mr. Kahane has had an opportunity to make a decision based upon personal choice. Kahane chose to give up his American citizenship to compete for a seat in the Knesset and further his political career. To achieve his goal, he chose to renounce his citizenship. Plaintiff had the chance to consider the several options and make a choice. Renouncing his American citizenship may have been difficult, but he did so voluntarily.

In *Richards, supra*, plaintiff moved to Canada and applied for a job with the Boy Scouts of that country. He was advised that he must first become a Canadian citizen, so he took an oath of allegiance that specifically renounced his United States citizenship. Later, Richards filed suit claiming his renunciation was the product of "economic duress." 752 F.2d at 1419. In rejecting that argument and holding that plaintiff had lost his citizenship, the Ninth Circuit reasoned:

> [A] person's free choice to renounce his citizenship is effective whatever the motivation. Whether it is done in order to make more money, to advance a career or other relationship, to gain someone's hand in marriage, or to *participate in the political process in the country to which he has moved*, a United States citizen's free choice to renounce his citizenship results in the loss of that citizenship.

752 F.2d at 1421 (emphasis added).

The facts of this case clearly show that the primary motivation for Kahane's renunciation was to participate in Israeli politics. Plaintiff wanted to advance his career and remain politically active in Israel, the country to which he has moved. Like the plaintiff in *Richards*, Kahane made these choices voluntarily.

## B. WILL PLAINTIFF SUFFER IRREPARABLE HARM?

Although Kahane is now an alien and unable to enter the United States at the moment, he is not foreclosed from traveling to this country. There are at least two paths by which plaintiff may obtain legal access to the United States, neither of which he has pursued. First, he may apply for a certificate of identity pursuant to 8 U.S.C. § 1503(b). This statute provides that any person who has been denied the right or privilege of a United States national based upon the ground that he is not a national of the United States may:

> [M]ake application to a diplomatic or consular officer of the United States in the foreign country in which he is residing for a certificate of identity for the purpose of traveling to a port of entry in the United States and applying for admission. Upon proof to the satisfaction of such diplomatic or consular officer that such application is made in good faith and has a substantial basis, he shall issue to such person a certificate of identity.

8 U.S.C. § 1503(b) (1987). Once a certificate of identity is issued, he may apply for

admission to the United States at any port of entry. 8 U.S.C. § 1503(c) (1987).

Plaintiff has not applied for such a certificate and therefore has not made the requisite showing of "good faith" nor shown "substantial basis." He knows that this alternative exists, and he is no stranger to the process. During the pendency of his 1985 lawsuit in the United States District Court for the Eastern District of New York, Kahane was successful in acquiring a certificate of identity. *See* note 1 *supra.*

The second available option is for plaintiff to seek a visa for travel to the United States on his Israeli passport. Counsel for the plaintiff has pointed out that the government could decide to deny the application because Kahane was convicted of criminal charges in the United States. *See United States v. Kahane,* 396 F.Supp. 687 (E.D.N.Y.1975), *modified* 527 F.2d 492 (2d Cir.1975) (In 1971, plaintiff pled guilty to making a bomb and was placed on five years probation. He later pled guilty and was sentenced for violating his probation.) The Court recognizes this potential problem, but it is not clear that Kahane will be denied a visa; nor will the Court speculate about the outcome, but will only point out that plaintiff has not been foreclosed from this option. "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wisconsin Gas Co., supra,* at 674.

It is clear that plaintiff has failed to avail himself of these alternative methods of entering the United States. As a result, plaintiff has not made the sufficient showing that he will be irreparably injured if he is not granted injunctive relief.

### C. BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Congress has set forth an elaborate scheme in the Immigration and Nationality Act, 8 U.S.C. 1101 *et seq.* (1987), regarding the loss of nationality and the admission to this country of people who have lost their United States citizenship. According to Carmen DiPlacido, the Department's Director of the Office of Citizens Consular Services whose office is responsible for making final determinations as to loss of nationality for persons not in the United States, and who personally reviews particularly significant cases, there have been approximately 5,000 cases each year in which loss of nationality is at issue. DiPlacido Decl. at ¶¶ 1–3 (October 26, 1988); DiPlacido Decl. at ¶ 5 (November 18, 1988). Of those 5,000 cases, the Department has approved approximately 1,000 CLN's—300 of which involved formal renunciations. Many of the individuals challenge the Department's issuance of a CLN, yet none have been treated as a United States citizen pending the outcome of these challenges. *Id.*

The government has made at least a sufficient showing, that if the Court were to grant preliminary injunctive relief, the CLN process may be disrupted. The Court finds that this express potential damage to government interests appears to outweigh the attenuated harm to the plaintiff. Moreover, the balance is further tipped toward the defendant due to the strong policy interest in compliance with congressional intent. Because adherence to the Immigration and Nationality Act is of vital importance, the public interest clearly favors the denial of plaintiff's motion for preliminary injunction.

### III. CONCLUSION

In *Afroyim v. Rusk,* 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), Justice Black announced that "[i]n our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship." *Id.* at 257, 87 S.Ct. at 1662. From the documents and record in this case, it appears that plaintiff guided by his personal and conscious choice, severed his relationship with the United States government.

Kahane knew or should have known that when he renounced his American citizenship the result would be the loss of his United States nationality, rights, and privileges. He specifically acknowledged that

he would become an alien with respect to the United States. While plaintiff's choices may have been difficult for him to make, he opted to pursue his political career in Israel. The Israeli parliament and Supreme Court may have foiled Kahane's political ambitions, but that is no concern of this Court.

Kahane voluntarily and deliberately selected one course of action over another. Under the circumstances, he cannot have it both ways. The fact that his plans have been stymied by the Israeli government does not grant him the opportunity to turn to this government for relief. To permit otherwise would wreak havoc with our nationality and immigration procedures.

While plaintiff has made a decision that he must live with, he is not foreclosed from entering the United States. He may pursue the available options permitting reentry. And while the Court will not speculate as to his success, there is no showing that he would be irreparably harmed if immediate injunctive relief is not obtained.

For the reasons set forth above, it is

### ORDERED

That plaintiff's motion for a preliminary injunction is denied.