# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2017

L. DAVID BENSKY,

*Plaintiff-Appellant*,

*v.*

COLIN POWELL, Secretary of State,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-0664-S—**John C. Shabaz**, *Judge*.

_____

ARGUED NOVEMBER 9, 2004—DECIDED DECEMBER 13, 2004

_____

Before FLAUM, *Chief Judge*, and CUDAHY and POSNER,
*Circuit Judges*.

POSNER, *Circuit Judge*. In 1964, David Bensky, a native-
born citizen of the United States, became a citizen of Israel
and enlisted in the Israeli army. The day before enlisting he
went to the American embassy in Tel Aviv and signed an
Oath of Renunciation of Nationality of the United States. The
consular officer before whom Bensky signed the oath
executed a Certificate of Loss of Nationality of the United

States, certifying that Bensky had lost his U.S. citizenship by virtue of his renunciation oath. The certificate was forwarded by the consulate to the State Department in Washington and approved, presumably pro forma given the voluntary character of Bensky's expatriation, by the Department a month later. All this was done pursuant to the procedure for expatriation set forth in 8 U.S.C. § 1501.

In 1985, Bensky filed an appeal with the State Department's Board of Appellate Review from the Department's approval in 1964 of the Certificate of Loss of Nationality. (Though called an "appeal," it was actually an original proceeding to revoke a status that he himself had sought.) He argued that his execution of the oath of renunciation had been involuntary—more precisely, that he had mistakenly believed that by joining a foreign army he had automatically lost his U.S. citizenship. Such a belief would indeed be mistaken. See *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967); *Vance v. Terrazas*, 444 U.S. 252, 258-63 (1980). (The latter decision may have been the stimulus to Bensky's 1985 appeal. See Lawrence Abramson, Note, "United States Loss of Citizenship Law after *Terrazas*: Decisions of the Board of Appellate Review," 16 *N.Y.U. Journal Int'l Law & Politics* 829, 848 (1984).)

His purpose in executing the oath, he contended, had been merely to make clear to the U.S. authorities that should he ever visit the United States he would not pretend to be a citizen. The reasoning process is unclear, but maybe his concern was that if he applied for a U.S. visa he would be told that he didn't need a visa because he was a U.S. citizen and then he'd have to explain that he wasn't a U.S. citizen because he'd enlisted in the Israeli army, and he might find that he had landed on some bureaucratic flypaper. But this is just conjecture. We know neither why he bothered to take the oath of renunciation or, for that matter, why he wants to reclaim his U.S. citizenship—for we were told at argument without contradiction that he intends to remain in Israel.

We shall not have to decide whether Bensky's mistaken belief that by enlisting in the Israeli army he had lost his U.S. citizenship would have provided grounds for restoration of his citizenship had he sought that restoration in a timely fashion. The Supreme Court held in the *Terrazas* case that "expatriation depends on the will of the citizen," 444 U.S. at 260, and ordinarily an explicit voluntary renunciation is compelling evidence of the will to expatriate. *Richards v. Secretary of State*, 752 F.2d 1413, 1421 (9th Cir. 1985); *United States v. Matheson*, 532 F.2d 809, 816 (2d Cir. 1976); *Davis v. District Director*, 481 F. Supp. 1178, 1181 (D.D.C. 1979). The question, which, to repeat, we shall not try to answer, as it would not affect our decision, would be whether a renunciation made under a mistaken understanding of the law should be treated as "voluntary."

No statute of limitations applied to appeals to the Board of Appellate Review until 1966, when the Board promulgated a "reasonable time" limitation, 31 Fed. Reg. 13537, 13539 (Oct. 20, 1966), 22 C.F.R. § 50.60 (1967-1979) (later replaced by a one-year statute of limitations, 22 C.F.R. § 7.5). That provision was in force when Bensky filed his belated appeal in 1985, and in 1987 the Board held that the provision was applicable to Bensky's appeal and barred it. Bensky did not seek judicial review of the Board's decision (which was administratively final, 22 C.F.R. § 7.9), as he might have done by suing the Secretary of State under the same provision under which he brought the present suit, 8 U.S.C. § 1503(a). It provides that "if any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action . . . against the head of such department or independent agency

for a judgment declaring him to be a national of the United States . . . within five years after the final administrative denial of such right or privilege."

This was not just one route that Bensky could have taken to obtain relief from the Board's decision; it was the only route. For by 1985 it was understood that the Administrative Procedure Act (which, as we'll see, might earlier have seemed a route open to Bensky) is not a source of subject-matter jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 105 (1977); see Abramson, *supra,* at 844 and n. 103; cf. Richard D. Steel, *Steel on Immigration Law* § 15:26 (2d ed., 2004 Supp.); Daniel Levy, *U.S. Citizenship and Naturalization Handbook* § 13.41 (2003).

Bensky did not sue. Instead he waited until 1998 and then asked the State Department to issue him a U.S. passport. The Department refused, on the ground that only a U.S. citizen is entitled to a U.S. passport. Within five years of being turned down Bensky filed the present suit, seeking a declaration that he remains a U.S. citizen despite the Certificate of Loss of Nationality issued and approved more than 40 years ago. He relies on the fact that until 1994 the procedure set forth in 8 U.S.C. § 1501 under which he lost his U.S. citizenship did not describe the State Department's approval of such a certificate as a final administrative action. Under the old law, he contends, it was not until the Department refused to issue him a passport that the denial of his administrative appeal in 1985 ripened into a final administrative action and so started the five-year statute of limitations running. The 1994 amendment provides that "approval by the Secretary of State of a certificate [of loss of nationality] under this section shall constitute a final administrative determination of loss of United States nationality . . . and also shall constitute a denial of a right or privilege of United States nationality for purposes of section

1503." The district court dismissed Bensky's suit after ruling that the statute of limitations had begun to run in 1964 because the State Department's approval of the Certificate of Loss of Nationality was a final administrative determination and therefore the period within which Bensky had to sue had long since expired.

There is a threshold question whether, as section 1503(a) requires, Bensky was "in the United States" when he filed this suit. As we said, he apparently intends to continue to live in Israel. An individual who is not in the United States and wants to establish that he is a citizen must first obtain a Certificate of Identity from a U.S. consular official authorizing him to travel to a port of entry into the United States, such as O'Hare Airport. 8 U.S.C. § 1503(b). If upon arrival he is arrested by the immigration authorities because they don't believe he is a citizen (or otherwise entitled to remain in the United States), he can seek habeas corpus and in that way obtain judicial review of his claim of citizenship. § 1503(c). In *Rusk v. Cort*, 369 U.S. 367 (1962), the Supreme Court, doubting that "Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States," held that such an individual could proceed alternatively by the declaratory-judgment route, just as if he were suing under section 1503(a). *Id.* at 372-80. The Court based jurisdiction, however, not on that section, which in terms is inapplicable to someone who is not in the United States when he sues, but instead on the Administrative Procedure Act—which only later, in *Califano v. Sanders, supra*, was held not to confer jurisdiction on the federal courts to review administrative decisions, but merely to prescribe how that jurisdiction, once conferred by some other statute, is to be exercised. Two district court cases hold, understandably

though in the teeth of *Rusk v. Cort* itself as well as of the statute, that a claimant who is not in the United States can nevertheless sue under section 1503(a), just like one who is. *Kahane v. Secretary of State*, 700 F. Supp. 1162, 1165 n. 3 (D.D.C. 1988); *Icaza v. Shultz*, 656 F. Supp. 819, 822 n. 5 (D.D.C. 1987).

Whether these decisions are right or wrong is of no importance to this case, however. Bensky's complaint alleged that he also "claims residence in Madison, Wisconsin," where his brother, who represents him in this matter, practices law. So we infer, in the absence of any denial by the government, that Bensky was in Madison when the suit was filed. We can proceed, then, to the merits.

The government argues that the 1994 amendment to section 1503, quoted earlier in this opinion, which made the Secretary of State's approval of a Certificate of Loss of Nationality a final administrative determination, was merely a clarification of existing law—that the approval of such a certificate had always been a "final administrative denial of such right or privilege" and therefore the date of that approval had always been the date on which the five-year statute of limitations began to run. So Bensky had to sue by 1969 and any argument that the running of the statute of limitations might be tolled (a question on which there is no law) is barred, as a matter of collateral estoppel, by the Board's unappealed determination in 1987 that Bensky had delayed unreasonably in failing to seek rescission of the certificate until 1985. Cf. *Cannon v. Loyola University of Chicago*, 784 F.2d 777 (7th Cir. 1986); *Witkowski v. Welch*, 173 F.3d 192, 199-200 (3d Cir. 1999); *Ortiz-Cameron v. DEA*, 139 F.3d 4, 5-6 (1st Cir. 1998); *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 896 (2d Cir. 1983).

The difficulty with the government's argument is that the wording of section 1501 (the substantive basis for this suit) before the 1994 amendment changed it doesn't cover what

happened to Bensky in 1964. He made no "claim" of a "right or privilege" of U.S. nationality then. He did the opposite of claiming a right of citizenship: he renounced *all* such rights. If nevertheless such a renunciation could be thought a claim—maybe one of the rights conferred by U.S. citizenship is the right to renounce one's U.S. citizenship—it was granted to Bensky, rather than denied to him, in 1964. *Whitehead v. Haig*, 794 F.2d 115 (3d Cir. 1986); *Maldonado-Sanchez v. Shultz*, 706 F. Supp. 54, 55-58 (D.D.C. 1989).

We are mindful that in *Heuer v. U.S. Secretary of State*, 20 F.3d 424, 427 (11th Cir. 1994), the issuance of a Certificate of Loss of Nationality was held, contrary to *Whitehead*, to be the denial of a claim to a right of U.S. citizenship. The court in *Heuer* pointed out that such a certificate can sometimes be issued over the individual's objection. True; but when that happens, the individual has indeed been denied a claim of U.S. nationality. Like *Heuer* itself, this is not such a case, or at least was not in 1964.

It seems, then, that the statute of limitations in section 1503(a) *was* changed by the amendment of section 1501 in 1994 to give the recipient of a Certificate of Loss of Nationality, at least if it had been issued at his request, five years from a final administrative denial of a claim, such as a claim for restoration of citizenship, within which to sue. Congress would be unlikely to change an accrual date to bar a claim that, under the previous accrual rule, had not yet arisen! See *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 608-09 (1987); *Jideonwo v. INS*, 224 F.3d 692, 697 (7th Cir. 2000); *In re Apex Express Corp.*, 190 F.3d 624, 642-43 (4th Cir. 1999); *Chenault v. United States Postal Service*, 37 F.3d 535, 539 (9th Cir. 1994). For under the unamended statute, a loss of nationality did not start the statute of limitations running until the loser had made a claim to a right or privilege of a U.S. national. If the government is right, Bensky lost his

right to sue sometime in 1969, even though, under the statute in force then, he could not sue until he filed a claim with the State Department for the restoration of his citizenship, which he did not do until 1985.

We acknowledge that our interpretation of section 1501's tangled history may open the door to belated suits by persons who lost their U.S. citizenship before the 1994 amendment became effective—and for the further reason that since the amendment makes the issuance of the Certificate of Loss of Nationality the *final* administrative denial, the certificate holder is not required to exhaust his administrative remedies within the State Department as a prerequisite to suit. 139 Cong. Rec. S8553-03 (July 1, 1993) (statement of Senator Kennedy). There is something undeniably odd about a suit challenging an administrative action that took place more than 40 years before the suit was filed, especially after a previous legal challenge to the action had been denied more than a decade earlier as having been untimely when filed. By the time Bensky appealed to the Board of Appellate Review in 1985, the consular officer who had executed the Certificate of Loss of Nationality, and who was the only witness besides Bensky to what had occurred 21 years previously, had died.

Laches (unjustifiable delay in suing that makes it difficult for the defendant to defend the suit) would probably close the door to many such suits. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002); *Costello v. United States*, 365 U.S. 265, 282 (1961); *Teamsters & Employers Welfare Trust v. Gorman Brothers Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002); *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir.1988). Although we cannot find a case that discusses whether laches can be invoked in a suit brought under section 1503(a), we can think of no reason why it cannot be. It should not have taken Bensky two decades to decide that he had renounced

his citizenship under a mistake of fact—by which time, as we said, the only witness to the renunciation, besides Bensky himself, had died.

Bensky's suit must fail even apart from laches, because the appeal he filed in 1985 with the State Department's Board of Appellate Review was unquestionably a claim within the meaning of the unamended section 1501, and so its denial by the Board started the five-year statute of limitations running almost 20 years ago. Indeed, his appeal to the Board of Appellate Review was a claim to *all* the rights and privileges of U.S. citizenship, since it sought a restoration of that citizenship.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*